646 A.2d 1050

Joseph Phillip ZEMO

v.

STATE of Maryland.

No. 1742, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Sept. 2, 1994.

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

M. Jennifer Landis, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Thomas E. Hickman, State's Atty. for Carroll County, Westminster, on the brief), for appellee.

Argued before MOYLAN and CATHELL, JJ., and ROSALYN B. BELL, Judge (Ret., Specially Assigned).

MOYLAN, Judge.

The appellant, Joseph Phillip Zemo, was convicted by a Carroll County jury of the breaking and entering of a gasoline station and related charges. On this appeal, he raises four contentions:

1) that the trial court erroneously admitted evidence that the appellant had remained silent after receiving his *Miranda* warnings;

2) that the trial court erroneously received hearsay evidence that the investigating detective had received information from a confidential informant that led him to the appellant;

3) that the evidence was not legally sufficient to sustain the convictions; and

4) that the trial judge erroneously refused to instruct the jury to consider whether certain State's witnesses were accomplices whose testimony would require corroboration.

We choose to consider the first two contentions together because they both involve the direct examination of Detective Michael Augerinos of the Westminster Police Department. In combination, moreover, they reveal an instance of prosecutorial "overkill," wherein the State, not by passing or careless reference but by a sustained line of inquiry, sought to "milk" the testimony of Detective Augerinos for far more than it was legitimately worth.

## *A Nutshell Preview*

Detective Augerinos was permitted to testify that he gave the appellant *Miranda* warnings and that the appellant, following those warnings, chose to remain silent. There was no legitimate purpose for that testimony. The appellant never took the stand and there was no arguable way in which his silence could have been used for impeachment purposes. Post–*Miranda* silence, moreover, has no legitimate relevance or probative value. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

■ Detective Augerinos's entire line of testimony leading up to his arrest and *"Mirandizing"* of the appellant, moreover, was equally inadmissible. He testified, over objection, that he received evidence about the crime from a confidential informant, that the informant's information put him on the trail of the appellant and other suspects, that other parts of the informant's information were corroborated and turned out to be correct, and that, acting on the informant's information, he arrested the appellant. The only possible import of such testimony was to convey the message that the confidential informant 1) knew who committed the crime, 2) was credible, and 3) implicated the appellant. Both the confrontation clause and the rule against hearsay scream out that the appellant was denied any opportunity to confront that confidential accuser.

### Random Error Versus Sustained Error

As we begin to examine the tainted testimony of Detective Augerinos, it is important to note what we are *not holding* and what we are *not even suggesting*. We are not counseling an overreaction to every passing or random interjection of some arguably prejudicial material into a trial. A few smudges of prejudice here and there can be found almost universally in any trial and need to be assessed with a cool eye and realistic balance rather than with the fastidious over-sensitivity or feigned horror that sometimes characterizes defense protestations at every angry glance. We are not talking about the expected cuts and bruises of combat. What we are objecting to in this case, rather, is a sustained and deliberate line of inquiry that can have had no other purpose than to put before the jury an entire body of information that was none of the jury's business. We are not talking about a few allusive references or testimonial lapses that may technically have been improper. We are talking about the central thrust of an entire line of inquiry. There is a qualitative difference. Where we might be inclined to overlook an arguably ill-advised random skirmish, we are not disposed to overlook a sustained campaign.

### The Chief Investigator as a Legitimate Witness

There was evidence to show that on the night of November 15–16, 1992, the appellant and an accomplice named Anthony Hughes broke into a gas station in Carroll County. They also broke into the nearby office of the gas station. Money was taken from the vending machines in the gas station. An effort to drill into the floor safe in the station was unsuccessful. Detective Augerinos investigated the break-in. His direct examination consumed thirty-three pages in the trial transcript. Over the course of the first eighteen of those pages, Detective Augerinos described his physical observations of the method of entry into the buildings, of the damage done to the vending machines that were broken open, and of the unsuccessful effort to drill into the floor safe. He was the key witness to the *corpus delicti* of the crime.

### The Chief Investigator as a Greek Chorus

At that point, however, Detective Augerinos's role in the drama was concluded, and it was time for him to depart the stage. Instead, he remained on center-stage for an additional fifteen pages of transcript, recounting events as to which he had no direct knowledge and which were themselves without relevance. Once he had, in the trial's opening scene, established the *corpus delicti* of the crime, it was then for other players to develop the appellant's unfolding complicity. Chief among those others was Anthony Hughes, the fellow criminal who entered a guilty plea to the breaking and entering and testified as a State's witness. Supporting Anthony Hughes were Hughes's wife and two other witnesses from whom both Hughes and the appellant had borrowed the tools they used for the breaking and for the drilling. Detective Augerinos had no proper role in the narrative unfolding of the appellant's criminal agency.

Detective Augerinos, nonetheless, lingered on stage almost in the role of a Greek Chorus. He vicariously imparted cryptic reports from unnamed sources off-stage, who would never appear before the live audience. Anticipating with

prescient antennae what was afoot, defense counsel objected with precision:

Q: Following your processing of the scene, what did you do in this investigation?

A: Well, we had all our items together, and we—at the time, we had no suspects. On November 29th, I had ...

Ms. Kreinar: Objection, Your Honor. I'd ask to approach at this time.

The Court: Okay.

(Counsel and the Defendant approached the bench, and the following ensued:)

Ms. Kreinar: Your Honor, according to the police report, *he received information from a confidential informant naming Joe Zemo and Anthony Hughes as suspects in this case.* I'd object to any information with respect to information he received from a confidential informant. (emphasis supplied).

### Exposing a False Myth

The State's explanation for its directorial decision was by way of resort to the familiar, if inapt, old chestnut that it is appropriate to apprise the jury of the course taken by the investigation:

*[B]ased on the information, the officer then conducted subsequent interviews* of Mr. Stultz, Anthony Hughes, Judy Hughes; that *there's an arrest made, and it all follows after that.*

Ms. Kreinar: But the testimony as to who he interviewed— I don't think that that's relevant as to who he interviewed. The people are witnesses, and they have a right to testify. Certainly, I could call him as a witness if they testify differently from his police reports or if they said something differently. He can't recount his interviews with these different people, and the fact that he conducted them.

Ms. McFaul: *I'm not going into the interviews of each person, just dates that he took them.*

The Court: Yeah. Okay. Okay. I'll overrule the objection under those guidelines. Okay? (emphasis supplied).

The State inquired further as to whether it could ask whether Detective Augerinos's decision to interview various persons was based on the information given to him by the confidential informant. The defense objected that that would be, in effect, to permit Detective Augerinos to say that "somebody, who's not coming into court, told him that they were suspects, and that's direct evidence." The defense explained, "I don't have any ability to cross-examine whether that information was good or bad." The State continued to insist, however, that the information was "not offered for the truth of the matter asserted" but was only offered as "to why he went where he went."

That, of course, is nonsense. It doesn't matter *why* Detective Augerinos went where he went. It doesn't even matter *where* he went, regardless of why. Not only is it a matter of complete immateriality *why* Detective Augerinos interviewed certain persons, it is equally immaterial that he, indeed, even interviewed those persons at all. The persons referred to, other than the appellant, all testified as witnesses. Their testimony was capable of standing or falling in its own right. It would only be in the eventuality that one of the parties sought to rehabilitate or to impeach testimonial credibility by offering the substance of the interviews as prior consistent or inconsistent statements that the very event of the interviews would take on any pertinence. That never happened. Where the event itself is immaterial, the reason for the event is *doubly immaterial*.

Defense counsel's focus was clear that the course of the detective's investigation had no bearing on the guilt or innocence of the appellant:

The question is whether Joe Zemo is guilty or not guilty. The fact of how [Detective Augerinos] made his investigation has no relevance to proving whether he's guilty or not guilty. The question is his testimony was as to what he saw, [not] [whom] he interviewed. The fact that he conduct-

ed an investigation of this case doesn't advance the [inquiry].... His testimony proves a corpus delicti. He doesn't have any direct knowledge that Joe Zemo's involved, and he can't testify, "Well, first I went here and first I went there."

The State, with the trial judge's agreement, continued to fall back on the doctrine that it was imperative "to lay out the course of the investigation":

> [T]he State's in a position where they have to lay out the course of the investigation, and Ms. Kreinar's already indicated she intends to attempt to damage this investigation. If I don't show a clear set of steps of how he came to this conclusion to start to interview them—they were merely suspects at the time ... and that's why he went the direction he went. (emphasis supplied).

At this point, it behooves us to point out that the State is retelling the "Old Wives' Tale" that it is somehow necessary always to lay out for the jury the detailed course of a criminal investigation. It is a tale that seems to be enjoying of late wide circulation at the prosecutorial council fires. It is an apocryphal tale, however, and one that urgently needs demythologizing.

■ The jury, of course, has no need to know the course of an investigation unless it has some direct bearing on guilt or innocence. That an event occurs in the course of a criminal investigation does not, *ipso facto*, establish its relevance. A valid criminal trial might well consist of nothing more than evidence of the *corpus delicti* of a crime on the East Coast on January 1 followed by the confession of the perpetrator on the West Coast on December 31. What the East Coast investigators did in the intervening year could be completely immaterial, just as could the intervening history of the perpetrator. The intervening events might, on the other hand, turn out to be relevant and material and the evidence of them competent. In such case, they would be fully admissible. If without pertinence, however, they would be quite beside the point.

The State's theory that the course of an investigation somehow must be shown, pertinent or not, assumes that a criminal

trial should unfold upon the stage of the courtroom with the unbroken linear quality of a silent movie. Modern audiences, however, both in the jury box and out, are capable of "leaping o'er time and space" as relevance and admissibility dictate.

The State's reliance on *McCray v. State*, 84 Md.App. 513, 581 A.2d 45 (1990), *cert. denied*, 322 Md. 131, 586 A.2d 14 (1991), is misplaced. In that case, unlike this, the unfolding course of the investigation was the heart of the State's case. In uncovering bribery within the Department of Motor Vehicles, a state trooper assumed an undercover role and posed as an individual wishing to bribe a public official to issue him a license in exchange for cash. The trooper was permitted to testify briefly that he had received the defendant McCray's telephone number and that that was how he made his initial contact. That explanation was pertinent because the subsequent contact with McCray was itself not only pertinent but was the *sine qua non* of the prosecution's case. Here, by contrast, there was no need to explain why Detective Augerinos came to interview the appellant because that interview itself was not pertinent.

The State's reliance on *Tu v. State*, 97 Md.App. 486, 631 A.2d 110 (1993), is even more misplaced. That case did place its *imprimatur* on evidence bearing on the thoroughness of a police investigation. The thoroughness of that investigation, however, had been put in issue by the defense. The charge was that the defendant had murdered his wife. Her body was never found. The defense position was that the wife had flown to California, that a customer relations agent of the airline had indicated to an interviewing detective that a woman resembling the wife had boarded an airplane bound for California, and that the police had negligently failed to follow up on that investigation. The evidence in question was the detective's reply that the investigation with airline personnel had, indeed, been very thorough, that at least half a dozen other employees of the airline and passengers had given responses contradicting the recollection of the customer relations agent, and that any further investigation through this

avenue was contraindicated. In this case, by contrast, there was no issue as to the thoroughness of the police investigation.

### The Appellant As a "Suspect"

After Detective Augerinos investigated the crime scene on the night of November 15–16, the trail went cold for two weeks. In his direct testimony, however, he was permitted to bring out, over defense objection, that he picked up the spore on November 29 by learning via the grapevine that both the appellant and the appellant's accomplice, Anthony Hughes, were involved:

Q: [U]pon investigating the scene, you had no suspects. Is that correct?

A: That's correct.

Q: Okay. Having done that, what did you do next?

A: Okay. The case, of course, just then remains open until you can obtain any type of lead through investigation. I received infor ...

Ms. Kreinar: Objection.

The Court: Overruled.

The Witness: ... *I received information* in this case on November 29th of 1992, *which led me to a couple of names.*

By Ms. McFaul:

Q: And, upon being led to those names—*what were the names you were led to?*

Ms. Kreinar: Objection.

The Court: Overruled.

The Witness: *I was given the name of Joe Zemo [the appellant]*. I was given the name of Mr. Stultz, and I was also given the name of Tony Hughes. (emphasis supplied).

The import of that testimony is indisputable. As of November 15–16, Detective Augerinos had no "suspects." Two weeks later, however, he "received information" which "led me to a couple of names," to wit, which then gave him some "suspects." The only rational conclusion that one can draw from the testimony is that the unnamed source passed on to

the detective knowledge that the appellant, "Joe Zemo," was implicated in the breaking and entering. Instead of letting it go then as an unadorned explanation of why Detective Augerinos decided both to interview and to *"Mirandize"* the appellant, the State sought immediately to bolster the credibility of the unnamed source and, thereby, to enhance the substantive value of the information itself:

Q: Now, being provided those names, what did you do with that information?

A: Okay. With this information, *I double-checked my reports and found that the information that I was getting was accurate* ... (emphasis supplied).

To be sure, the defense objected. The court ultimately sustained the objection, but only after the State doggedly dug in its heels in an effort to establish the reliability of the confidential information:

[L]et me proffer to the Court what makes it reliable. What makes it reliable is the person who gave him the information gave *details of the breaking and entering that no one would know except* an investigating officer ... or *someone who knew something about the crime.* (emphasis supplied).

Defense counsel made it clear what effect the information was having on the jury:

[W]hat has come in is some unknown person has accused Joe Zemo, and that's what's in the jury's mind. That's prejudicial. It's not competent evidence.

As far as any further effort to bolster the credibility of the confidential informant, the trial judge did sustain the appellant's objection:

I've let in that he's gotten *information which led him to* Zemo, Hughes, and Stultz. Okay? I don't think it's necessary, then, to prove the veracity of this confidential informant.

The direction of the examination of Detective Augerinos then turned to his interviews with the three persons to whom he had been "led" by his confidential informant. On January

1, he talked to Roy Stultz, apparently without feeling it necessary to *"Mirandize"* him. In contrast to the later reticence of the appellant, Roy Stultz "gave us the information." Roy Stultz subsequently testified for the State at trial and that testimony was apparently consistent with the statement he had given to Detective Augerinos. As one of three "suspects" fingered by the confidential informant, Roy Stultz, even if not himself an accomplice, obviously knew something about the crime.

Anthony Hughes was a more difficult nut to crack. He was brought to the station house on January 12 and *"Mirandized."* He chose not to talk. Subsequently, on January 20, he was arrested and brought back to the station house. On that occasion, he gave both an oral and a written statement. Under a plea agreement with the State, he testified at trial as a State's witness against the appellant. That testimony was apparently consistent with his earlier statements to the police. As the second of the three "suspects" fingered by the confidential informant, Anthony Hughes was admittedly deeply implicated in the crime. The confidential informant demonstrably had known what he was talking about. The question took on added significance, therefore, as to how and why evidence from or about the confidential informant ever got into the trial in the first place.

That was the full context of the direct examination of Detective Augerinos as attention then focused on the detective's effort, on January 20, to interview the third of the three "suspects" fingered by the confidential informant:

Q: Okay. And did—did you talk to Mr. Zemo?

Ms. Kreinar: Objection.

The Court: Overruled.

The Witness: I tried, yes.

BY MS. McFAUL:

Q: And what happened?

Ms. Kreinar: Objection.

The Court: Overruled.

The Witness: *I read Mr. Zemo Miranda ...*

Ms. Kreinar: Objection.

The Court: Overruled.

The Witness: ... *and Mr. Zemo did not want to talk to me.* (emphasis supplied).

With that response that the appellant had chosen to remain silent, the direct examination of Detective Augerinos immediately veered in another direction. The taboo reference to the silence here was obviously no inadvertent lapse by a careless witness nor even a gratuitous little bonus tossed in by a more clever witness. Such evidentiary missteps are little more than ordinary trial static. The harkening to the sound of silence on this occasion was, by contrast, the very end sought by this entire phase of the examination.

### *"Mirandizing" the Appellant*

What legitimate relevance to the appellant's guilt or innocence, we ask initially, did it possibly have that he had been "read ... *Miranda?*" If he had given a *"Mirandized"* statement that the State were offering in evidence, then, to be sure, the State might have to show its compliance with *Miranda* at the very threshold of admissibility. Where no statement was being offered and tested for admissibility, on the other hand, the appellant's silence in response to the *Miranda* warnings was immaterial. Indeed, the very giving of the *Miranda* warnings was immaterial. Indeed, the very fact that the appellant had even been interviewed was immaterial.

Nothing of any conceivable significance was being established by such references. What, moreover, was the possible downside? Every lawyer knows that *Miranda* warnings are required only when a suspect is in the throes of custodial interrogation. Every layman knows that the police give *Miranda* warnings to those whom they have arrested and whom they are about to question for involvement in a crime. The gratuitous reference to *Miranda* told the jury something about the appellant. In the world view of the laity, "good guys" don't get *"Mirandized."* At the very least, those who the police think are "good guys" don't get *"Mirandized."*

## The Appellant's Silence

■ So much for the gratuitous reference to *Miranda*.[1] What, then, of the gratuitous reference to the appellant's consequential silence? Adverse comment (nay, all comment) on a defendant's invocation of a right to silence is constitutionally forbidden but not because such silence is irrelevant. It is very relevant. It is at times devastatingly relevant. Silence sometimes speaks volumes. It is a common lay perception that those who won't talk frequently have something to hide. *Miranda*, after all, implements in the station house the constitutional privilege against compelled self-incrimination in the courthouse. Even laymen can figure out that when one is privileged not to respond because of self-incrimination, it is because the response, if unprivileged, would be incriminating. Because of the natural (and by no means illogical) tendency to equate silence with guilt, the Constitution in many circumstances, including the one at bar, forbids even mentioning, and thereby drawing attention to, such silence. Flouting the constitutional taboo, attention was drawn to the appellant's silence in this case.

In the last analysis, Detective Augerinos had not one shred of admissible evidence bearing on the criminal agency of the appellant. Yet by the end of Detective Augerinos's testimony, the finger of presumptive guilt was already pointing unmistakably at the appellant.

## The Ineffable Sound of Silence

The constitutional prohibition against bringing to the attention of the jury the fact that a defendant, in response to

---

1. Our mention of the gratuitous reference to the giving of the *Miranda* warnings is only for the purpose of placing in fuller context the subsequent gratuitous reference to the appellant's silence in response to those warnings. We are by no means intimating that a gratuitous reference to the giving of *Miranda* warnings would ever, in and of itself, constitute cause for reversal. Any citation of our remarks above as authority for such a proposition would be an erroneous citation as support for a principle for which this opinion does not stand.

*Miranda* warnings, chose to remain silent comes straight from the *Miranda* case itself:

> In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. *The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.* (emphasis supplied).

*Miranda v. Arizona,* 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1624–25, n. 37, 16 L.Ed.2d 694, 720 n. 37 (1966).

In *Younie v. State,* 272 Md. 233, 244–245, 322 A.2d 211 (1974), the Court of Appeals spoke to the same effect:

> Turning now to the evidence in this case, all that is present in the record indicates that *Younie was in fact relying upon his right to remain silent* rather than waiving it *when he failed to answer the police officer's interrogatories.* In the first place, the petitioner stated at the outset of his interrogation that he would agree to answer *only "some "* of the questions. In addition to this, since the words of the statement "refused to answer" concededly were those of the interrogator and not of the accused, it is impossible to determine exactly how he did respond. Since a waiver of this constitutional right to be effective must be clearly and intentionally made, and since silence, even in the face of incriminating accusations, statements, or questions, is inaction and therefore difficult to draw an inference from, in a situation such as this where it is uncertain as to what occurred, we must assume that the petitioner's failure to answer was an invocation of his fifth amendment privilege. We agree with the Court of Special Appeals when it said in *Duckett v. State,* 3 Md.App. 563, 578, 240 A.2d 332 (1968) that "[a]s the [petitioner was] then in police custody, *the admission of evidence calculated to show that [he] stood mute in the face of such accusation would, of course, have been clear error.*" (footnote omitted) (emphasis supplied).

In *Burko v. State,* 19 Md.App. 645, 652, 313 A.2d 864 (1974), *vacated on other grounds,* 422 U.S. 1003, 95 S.Ct. 2624, 45

L.Ed.2d 667 (1975), Judge (later Chief Judge) Gilbert observed:

> To allow the police to make an accusatory statement to one who had elected to remain silent and then to permit the police to testify that when the defendant had been accused he did not answer, would have a devastating effect upon the defense. Such tactics, if allowed, would have cloaked the precepts of *Miranda* in an armor of gauze.

In *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91, 98 (1976), the Supreme Court held unequivocally that post-*Miranda* silence, even in the face of an accusation that might otherwise call for response, has no value as a tacit admission:

> We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. (footnote omitted).

The State's distinguishing of this case from *Doyle v. Ohio* is ingenious, to say the least. It points out that in *Doyle* the defendant's silence was used to impeach his testimonial credibility, whereas in this case it was not. That is quite true. Rather than being used for a peripheral purpose, the use of the silence here was sufficiently open-ended as to have had a likely bearing directly on the very merits of guilt or innocence. The distinction, in effect, tells us that the constitutionally forbidden reference to silence here was not as it was in *Doyle*; it was worse. That distinction won't take the State anywhere.

### Legal Sufficiency of the Evidence

■ Because it may have a critical bearing on some future double jeopardy claim, it behooves us to address as well the appellant's contention that the evidence was not legally sufficient to sustain the convictions. More particularly, he claims that the evidence was not legally sufficient to corroborate the testimony of the admitted accomplice Anthony Hughes. We do not agree. There was testimony from Roy Stultz, from Travis Conaway, from Brian Lee, and from Judy Hughes.

The testimony of any of them was legally sufficient to supply that slight corroboration required. They were not accomplices. *A fortiori*, they were not undisputed accomplices as a matter of law. Failing to establish that, the appellant cannot viably claim that the evidence was not legally sufficient to support his convictions.

*JUDGMENTS REVERSED; COSTS TO BE PAID BY CARROLL COUNTY.*