722 A.2d 385

Benjamin James CASEY

v.

STATE of Maryland.

No. 1945, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Jan. 4, 1999.

334

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joseph I. Cassilly, State's Atty. for Harford County, Bel Air, on the brief), for appellee.

Submitted before MURPHY, C.J., and RICHARD R. BLOXOM (specially assigned) and PAUL E. ALPERT (Ret'd., specially assigned), JJ.

MURPHY, Chief Judge.

In the Circuit Court for Harford County, a jury convicted Benjamin James Casey, appellant, of murder and conspiracy to commit murder. The State's evidence was sufficient to establish that he committed each of those offenses after he was hired by one Kenneth Daughton to kill the victim. Appellant does not argue to the contrary. He does contend, however, that he is entitled to a new trial and presents the following questions for our review:

I. Did the trial court err in admitting into evidence as part of Appellant's statement to police a)his invocation of the right to counsel and b) the opinion of an interrogating officer that Appellant was not telling the truth?

II. Did the trial court err in denying Appellant's motion to strike a non-responsive answer to defense counsel's question, resulting in improper evidence that an alleged co-conspirator of Appellant had entered a plea of guilty?

III. Did the trial court erroneously permit improper prosecutorial closing argument?

IV. Did the trial court err in permitting the State to cross-examine Appellant concerning his hiring of

counsel and information that he imparted or chose not to impart to counsel?

V. Did the trial court err in admitting into evidence certain aspects of the police investigation relating to William Haynes?

VI. Did the trial court err in refusing to compel the State to turn over statements of Detective Cole for the purposes of cross-examination at the hearing upon Appellant's motions to suppress evidence?

VII. Did the trial court err in denying Appellant's motion to dismiss the indictment?

We answer "yes" to questions I, II, IV, and V, and must therefore reverse the judgments of the circuit court. We shall also address the remaining issues that are certain to arise when this case is tried again.

## Background

On October 29, 1994, Michael Corey Allendorf was shot and killed outside his residence in Joppa, Maryland. On March 6, 1996, appellant was charged with Allendorf's murder. Kenneth Daughton, who had entered a guilty plea for his role in the murder, testified that he hired appellant and William Hynes to kill Allendorf for Two Thousand Dollars ($2,000.00).[1]

Daughton's credibility was attacked by several defense witnesses.[2] Because Daughton knew many details surrounding

---

1. According to Daughton, he fell. in love with Luana Gill, who asked him to kill Allendorf because Allendorf had abused her. Daughton supplied appellant with a .32 caliber gun and a One Thousand Dollar ($1,000.00) advance. Gill provided Daughton with Allendorf's shotgun, which he gave to appellant and Hynes. Daughton then drove them to locations Allendorf frequented and suggested that the murder take place at one of those locations. On the night of the shooting, appellant paged Daughton and stated that he was following Allendorf. Appellant later paged Daughton to advise that he was going to commit the crime in front of Allendorf's house, because the locations suggested by Daughton were too public.

2. Daughton, who characterized himself as "dishonest," is serving a fifty year sentence for his role in the murder.

the shooting, the defense argued that he may have been the shooter. Appellant testified that, although he did agree at one point to "beat (Allendorf) up," he played no role in the murder.

## I.

Appellant argues that the circuit court erred when it admitted the following portion of a February 1, 1996 tape recorded statement he gave to the investigating officers:

[APPELLANT]: I never talked to [Daughton] about beating up the guy.

[OFFICER COLE]: Um you know we have too much information for you to sit here and tell us that you don't know what we're talking about. OK? Um and we're talking about something serious, OK. This isn't play time.

[APPELLANT]: This is obviously serious.

[OFFICER COLE]: This is obviously serious. Um I can see exactly what happened here. . . . Uh I think you knew about, you know, from what I'm hearing you're the type of guy if somebody needs a hand you're glad to lend it. And uh I think that's what happened basically, is Daughton's [sic] were having a problem and they came to you and I think you have some, you know, you have loyalty to your friends and I think you got uh hooked into something you didn't want to be. . . . And um it, and it's up to you. You can sit and, you know, we, you can sit here and tell us you don't know anything about it and we know that's not true. Um we know some of the people. And it's not just what[Daughton] told us. We've talked to [Gill] . . . and we have some other records, you know, we have access to a lot of records that can back up some of the information that [Daughton] and [Gill] were telling us and uh so it's not just

[APPELLANT]: For example?

\* \* \*

[OFFICER KECK]: Before [Daughton] and [Gill] were arrested there, there was a wire tap placed on [Gill's] phone and uh [Daughton's] phone

[OFFICER COLE]: Well, the point, yeah, the whole in this is that we've been working on this year and a half and it's too long for you to sit here and tell us we don't know what we're talking about, cause we know that's not true. . . . You can help us, you can. If not, then, you know, that's up to you. But don'tsit here and tell us you don't know anything about it cause we know that's not true.

\* \* \*

[OFFICER KECK]: You know, you can set [sic] there all you want and deny you have any knowledge of what's going on, but we know different. This is your opportunity, your saving grace at this point.

[APPELLANT]: I think my best bet right now is from here on out end this conversation. Speak to a lawyer.

 Appellant's trial counsel interposed a timely objection to the introduction of this evidence. The circuit court overruled that objection, but did instruct the jurors that they should draw no inference of guilt from appellant's invocation of his right to counsel. We are persuaded that there are two reasons why the evidence at issue should have been excluded.

 It is well settled that evidence of an accused's intent to obtain the advice of counsel is inadmissible under Maryland Rule 5–401. In *Waddell v. State,* 85 Md.App. 54, 582 A.2d 260 (1990), this Court reversed a first degree murder conviction because the jury received evidence of appellant's intent to obtain counsel. We rejected the State's argument that the jury would be unlikely to equate a request for counsel with evidence of guilt:

> A juror, even without the prosecutor's suggestive comments, easily might infer from the witness's testimony that appellant planned to obtain counsel because he had done something for which he needed a lawyer to defend him. . . . As an evidentiary matter, the testimony was irrelevant and should not have been admitted into evidence.

*Id.* at 65, 582 A.2d 260, *citing Hunter v. State,* 82 Md.App. 679, 690–691, 573 A.2d 85 (1990). In *Hunter,* this Court

reversed a conviction for negligent homicide by motor vehicle while intoxicated because the jury received evidence that appellant contacted his attorney immediately following the fatal accident:

> To draw an inference of consciousness of guilt from the seeking of such advice, then, is both illogical and unwarranted; the fact to be inferred—the consciousness of guilt—is not made more probable (or less probable) from the mere seeking of legal advice or representation,and so evidence of the predicate fact is simply irrelevant. On pure evidentiary grounds, it is inadmissable.

*Id.* at 691, 573 A.2d 85.

It is also well settled that the investigating officers' opinions on the truthfulness of an accused's statement are inadmissible under Maryland Rule 5–401. In *Crawford v. State,* 285 Md. 431, 404 A.2d 244 (1979), the Court of Appeals reversed a first degree murder conviction because the jury heard evidence of a tape recorded interrogation during which police officers expressed disbelief in the defendant's story. The Court held:

> The credibility of the accused was all important in the determination by the jury of the validity of her claim throughout the interrogations that she killed in self-defense. There is no doubt that the challenged comments of the police which were heard by the jury, whether in the form of questions, assertions of disbelief, ... tended to seriously prejudice the defense. We think they did so improperly in the circumstances.

*Id.* at 451, 404 A.2d 244. *See also Snyder v. State,* 104 Md.App. 533, 554, 657 A.2d 342 (1995) in which this Court reversed a murder conviction because the jurors heard an investigating officer's testimony that "clearly brought out the obvious disbelief of the police in [appellant's] version of what happened." On remand, the above quoted portion of appellant's statement must not be presented to the jury.

## II.

The following transpired during defense counsel's cross-examination of Kenneth Daughton:

[APPELLANT'S COUNSEL]: But during the wiretap neither you, nor [Gill] to you, mentioned the name Benjamin Casey; is that correct?

[DAUGHTON]: Because she probably forgot it?

[APPELLANT'S COUNSEL]: She probably forgot it?

[DAUGHTON]: She did make the statement when she made her plea that his name came up.

[APPELLANT'S COUNSEL]: Move that be stricken, Your Honor.

[PROSECUTOR]: Your Honor, he asked the question.

[APPELLANT'S COUNSEL]: No. I didn't ask that question.

THE COURT: Overruled.

■■■ We are persuaded that defense counsel's motion should have been granted. The State is not entitled to present evidence of an alleged co-conspirator's guilty plea. *Clemmons v. State*, 352 Md. 49, 57–58, 720 A.2d 1170 (1998). "When a factfinder is shown that the conspirator, with whom an accused has been charged with having conspired, has pled guilty, there is more than a 'reasonable possibility that the evidence ... may have contributed to the rendition of the guilty verdict.'" *Carr v. State*, 50 Md.App. 209, 211, 437 A.2d 238 (1981). On remand, unless Luana Gill's plea agreement becomes relevant to her credibility as a witness, the circuit court must not admit evidence of that agreement.

## III.

■■■ Appellant next argues that the circuit court erred when it allowed the prosecutor to express a personal opinion about Daughton's credibility. The following transpired during the prosecutor's closing argument:

[STATE]: I do know that [Daughton] is not lying. So, it's only going—

[APPELLANT'S COUNSEL]: Objection to the State's opinion about any witness.

[THE COURT]: Overruled.

A prosecutor "has a right to state his views as to what the evidence shows." *Riggins v. State,* 125 Md. 165, 174, 93 A. 437 (1915). The prosecutor must, however, make it clear that this assertion is based on the evidence presented to the jury. *Williams v. State,* 50 Md.App. 255, 266, 437 A.2d 665 (1981). We trust that on remand the circuit court shall prohibit any "personal belief" argument that implies knowledge of Daughton's credibility based on evidence other than that presented to the jury.

## IV.

After appellant and Hynes were arrested, they were confined in different cell blocks at the Harford County Detention Center. While incarcerated, appellant wrote a letter to Kent Brewer, who was confined in the cell block to which Hynes had been assigned. This letter included the following passage:

> *Listen, this is very important. Tell Bill, that apparently someone said that we told them, that we committed the crime. He probably will come up with same* [sic] *thought as me. Tell him not to talk to anybody, including the cops or his attorney about it. I am going to bring the name and the situation up to my attorney when it is appropriate. The States Attorney is cooperating well with my lawyer, so I probably have more information than he does.*

Instead of performing as requested, Brewer turned the letter over to Daughton, who then turned it over to the State. No objection was interposed when the letter was introduced into evidence during the State's case-in-chief. The following transpired during appellant's direct examination:

Q. . . . Why did you write that (letter)?

A. Well, you have stated to me that there was a witness, and that the State's Attorney had told you who supposedly was saying that we told him that we had committed the crime. And, at least, that was the understanding which I

had, and I wanted to let Bill know the information, for one thing, so he would know what was going on as far as why we—they just finally charged us with the crime. And also because I didn't want him speaking to his attorney or anyone, because, first of all, I had heard—I had been in jail for less than a week, and I heard all kinds of things, rumors, and all the stories about Public Defenders.

Q. Let me stop you right there. Who did you believe was representing Bill at that time?

A. I hadn't had any clue whatsoever, and I figured it might be a Public Defender. And the stories I was being told by people within the jail, inmates, was Public Defenders, you really had to be careful what you said to them. They tend to take your evidence and use it against you, and rather than work for me, they work for the State and took a paycheck from the same people that the Prosecutors do. There's all kinds of crazy rumors.

Q. That's why you wrote the letter?

A. That's why. That's the reason why I wanted to contact Kent, because I knew that Kent was in the same cell block as Bill. So, he would be able to get the information to him for me.

Appellant does not challenge the admissibility of this letter. He does argue, however, that neither the letter nor his direct examination "opened the door" to cross-examination about (1) the timing of his decision to obtain the services of a lawyer, or (2) his communications with counsel that were unrelated to the letter. We agree with that argument.

The following transpired during appellant's cross-examination:

[PROSECUTOR]: After you were stopped by the police in February of 1996, you retained an attorney rather early on, didn't you.

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Approach the bench.

[THE PROSECUTOR]: Your Honor, I know for a fact that Mr. Casey retained [Defense Counsel] early, because [Defense Counsel] called me and one of the issues is why this Defendant would keep any information from his attorney, and this letter that he wrote is—it's very apparent that he's in jail, and his attorney, who he hired prior to his arrest, and he still, at this point, was keeping information from his own attorney even before he was arrested. I think it shows an attempt to keep damaging information from his own lawyer, shows guilty knowledge, and also advising Bill Hynes to do the same thing also shows guilty knowledge.

\* \* \*

THE COURT: Okay, So it's been interjected into it, and I certainly will not allow any inferences or argument that the retention of an attorney is an inference of guilt, but I would allow questions as to whether or not he kept information from him.

Following the bench conference, the prosecutor conducted a repetitive cross-examination that consumed 18 pages of trial transcript, and was punctuated with timely and appropriate objections of appellant's trial counsel, only one of which need be included in the following excerpt:

[PROSECUTOR]: Mr. Casey, you retained an attorney at some point prior to your arrest—prior to your arrest in March of '96, didn't you?

[APPELLANT]: Yes, Ma'am, I did.

[PROSECUTOR]: And that was [Defense Counsel] wasn't it?

[APPELLANT]: Yes, ma'am, it was.

\* \* \*

[PROSECUTOR]: Mr. Casey, the way I read this letter, it appears that when [Defense Counsel] told you that he—the State had someone, a witness, that you didn't tell him, oh, yeah, it's Randy Ransom, did you?

[APPELLANT]: Umm, I told my attorney that I had a feeling that the witness was Randy Ransom. I don't—I believe it was nearly immediately yes.

[PROSECUTOR]: Well, let me ask you this. The next thing that you say is—well, about two sentences down, you say, I'm going to bring the name and the situation up to my attorney when it's appropriate.

[APPELLANT]: Yes, and I found it to be appropriate very soon after.

[PROSECUTOR]: Well, you're stating that you're telling Bill that you're going to bring it up when it's appropriate, meaning that you didn't mention—you haven't done it yet, correct?

[APPELLANT]: That is reasonable, yes.

[PROSECUTOR]: Well, I know it's reasonable, but is it correct?

[APPELLANT]: Yes, ma'am.

[PROSECUTOR]: So you didn't tell your lawyer?

[APPELLANT]: I told my attorney very shortly after. My actual meaning behind all of that was whether or not it was appropriate. Was it appropriate for me to go ahead and tell my attorney, but as I stated before, I had fear of his representation.

[PROSECUTOR]: You had fear of whose representation?

[APPELLANT]: Mr. Hynes.

[PROSECUTOR]: But you didn't have fear of [Defense Counsel's] representation did you?

[APPELLANT]: No, ma'am, he was a paid lawyer, and all of the rumors that I heard within the facility were about Public Defenders.

[PROSECUTOR]: And yet you're telling Bill in this letter through another inmate that you haven't told [Defense Counsel] about Randy and that you will do so when it's appropriate?

[APPELLANT]: Yes, ma'am, see, [Defense Counsel], after telling me about this, as I said, I had to ponder it for a few

moments. It wasn't very long. I gotten [sic] off the phone. I thought about it, realized who it probably was, and then I had written this letter, okay,and then there was a very short time thereafter—I probably would say, most likely, probably within the hour of writing the letter; I couldn't say specifically—that I made my attorney aware.

 \* \* \*

[PROSECUTOR]: You're aware that certainly [defense counsel] told you what goes on between lawyers and client—

[APPELLANT'S COUNSEL]: Objection, Your Honor, to anything concerning that.

[PROSECUTOR]: I'll rephrase it.

[PROSECUTOR]: Are you aware that what a person tells their attorney is kept confidential?

[APPELLANT'S COUNSEL]: Objection. May we approach the bench?

(Whereupon, Counsel approached the bench out of the hearing of the jury.)

[APPELLANT'S COUNSEL]: Move for mistrial. Again, she has had a whole line of questioning concerning privileges, skirting on the edges, and I think it's gone well over by now, and any conversation that I have with my client is privileged and any inference of what I have is maybe not available to anyone else is privileged, and it all is to be used to infer guilt on the part of the Defendant, and I would make a motion for mistrial.

 \* \* \*

[PROSECUTOR]: What is your understanding, Mr. Casey, about what an attorney is permitted to reveal as far as information that comes from his client?

[APPELLANT]: An attorney is not permitted to, best of my knowledge, to reveal the information given to them to anyone. However, as I stated before, that was not the rumor that I was hearing. . . .

 We agree with the circuit court that the State was entitled to question appellant about the text of his letter, about

those conversations with his attorney disclosed in the letter, and about the fact that the letter contains a disclosure of his then existing intent to communicate information to his counsel. *Shawmut Mining Co. v. Padgett,* 132 Md. 397, 404, 104 A. 40 (1918); *Fraidin v. Weitzman,* 93 Md.App. 168, 228, 611 A.2d 1046 (1992), *cert. den.,* 329 Md. 109, 617 A.2d 1055 (1993). On the record before us, however, we are persuaded that appellant's letter did not open the door to cross-examination about anything else that appellant did not disclose to his attorney. The privilege at issue [3] protects against "testimony that no such communication was ever made between the client and the attorney." *Harrison v. State,* 276 Md. 122, 152, 345 A.2d 830 (1975).

The State argues that appellant's direct examination opened the door to the cross-examination about which he now complains. We are persuaded, however, that appellant's explanation for his limited disclosure of a single piece of information supplied by his counsel did not "open the door" to cross-examination about any other privileged communications:

> We must emphasize that the "opening the door" rule has its limitations. For example, it does not allow injecting collateral issues into a case or introducing extrinsic evidence on collateral issues. Such evidence is also subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

*Clark v. State,* 332 Md. 77, 87, 629 A.2d 1239 (1993). Appellant was unfairly prejudiced by questions about when he obtained counsel, and by questions about privileged communi-

---

**3.** Md.Code (1974, 1995 Repl.Vol.), Section 9–108 of the Courts and Judicial Proceedings Article provides:

A person may not be compelled to testify in violation of the attorney-client privilege.

cations unrelated to the limited disclosure made in his letter to Kent Brewer.

When this issue arises at the next trial, the circuit court should resolve it in accordance with the procedure called for in *Harrison, supra,* 276 Md. at 151, 345 A.2d 830, "a preliminary inquiry out of the presence of the jury" to identify the permissible and the prohibited areas of inquiry. The State is, of course, entitled to introduce appellant's letter to Brewer. If appellant testifies, the State will be entitled to establish on cross-examination (1) that he received from counsel the information disclosed in the letter, and (2) that the letter expressed his then existing intent. Unless appellant's direct examination "opens the door" to other privileged communications, however, the circuit court must not allow the State to question appellant about (1) when he obtained counsel, (2) anything else that he said—and did not say—to his attorney, and (3) anything else that his attorney said—and did not say—to him.

## V.

We agree with appellant's contention that the circuit court should not have admitted evidence that the police interviewed William Hynes. The jury could have inferred from this evidence that Hynes implicated appellant as the murderer. In *Zemo v. State,* 101 Md.App. 303, 646 A.2d 1050, (1994), this Court held that the investigating officer should not have been permitted to testify that "the informant's information put him on the trail of the appellant and other suspects . . . and that acting on the informant's information, he arrested appellant." *Id.* at 306, 646 A.2d 1050. In the present case, there was simply no need for the investigating officer to testify about the steps of his investigation:

> The jury, of course, has no need to know the course of an investigation unless it has some direct bearing on guilt or innocence. That an event occurs in the course of a criminal investigation does not, *ipso facto,* establish its relevance.

*Id.* at 310, 646 A.2d 1050; *See also Hall v. State,* 119 Md.App. 377, 705 A.2d 50 (1998), in which "none of the testimony

concerning the police investigations ... had any direct bearing on the guilt or innocence of appellant." *Id.* at 383, 705 A.2d 50. Unless and until the defense accuses the investigators of doing a "sloppy job," what was done to solve the crime is inadmissible under Md. Rule 5–401.

## VI.

What a State's witness testifies to on direct examination controls the issue of which statements must be provided to defense counsel before cross-examination begins. It is obvious that, when an investigating officer's direct examination is limited to what occurred during an interrogation of the defendant, defense counsel is not entitled to inspect those portions of the officer's report that are unrelated to the interrogation. On the other hand, defense counsel is entitled to each portion of the report that contains or constitutes a statement of the officer/witness that would be admissible as a prior inconsistent statement under Md. Rule 5–613—or as a prior consistent statement under Md. Rule 5–616(c)(2). To obtain appellate review of the circuit court's ruling on this issue, defense counsel must request that the material at issue "gets in the record." *Leonard v. State,* 46 Md.App. 631, 637, 421 A.2d 85 (1980).

## VII.

Appellant is not entitled to a dismissal of the indictment, even though it was returned by a grand jury that received evidence from a wiretap conceded to have been unlawful.[4]

The grand jury is an inquisitional and accusatory body. It does not determine the guilt or innocence of the accused as that decision is vested in the petit jury or court, if there be

---

4. The implementing order named appellant's father, and not appellant, as the target. The grand jury listened to recorded conversations between appellant and Daughton's daughters, during which appellant attempted to persuade them to provide him with an alibi for the murder.

a non-jury trial. That an indictment is founded on tainted evidence is no ground for dismissal as "... [N]ormally,there is no limitation on the character of evidence that may be presented to a grand jury...." *Gelbard v. United States,* 408 U.S. 41, 60, 92 S.Ct. 2357, 2367, 33 L.Ed.2d 179, 193 (1972); *United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). The rules of evidence are not applicable to grand jury proceedings.

*Hopkins v. State,* 19 Md.App. 414, 426, 311 A.2d 483. Suppression of the evidence at trial, rather than dismissal of the indictment, is the appropriate remedy.

**JUDGMENTS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY HARFORD COUNTY.**