**Geiger v. State, No. 2668 of the 2016 Term, Opinion by Moylan J.**

**HEADNOTE:**

THEFT BY DECEPTION– TO FIND NOTHING IS TO DISCOVER SOMETHING – DETECTIVE KELLY SPOKE FOR HIMSELF – THE QUINTESSENCE OF HARMLESSNESS – SITTING IN THE DOCK – PROCEEDING ON "INFORMATION RECEIVED" – FACIAL PROFILING TECHNOLOGY – HARMLESS ERROR REDUX – A READER'S GUIDE TO <u>ZEMO V. STATE</u>

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2668

September Term, 2016

_____

LAMONT JEFFERY GEIGER

v.

STATE OF MARYLAND

_____

Friedman,
Beachley,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: December 5, 2017

This is a simple case of theft by deception. At least, it should have been simple. The appellant, Lamont Jeffery Geiger, was convicted in the Circuit Court for Charles County by Judge Amy J. Bragunier, sitting without a jury, of theft pursuant to Maryland Code, Criminal Law Article, Sect. 7–104. For penalty purposes, it was a theft of property with a value of at least $1,000 but less than $10,000, pursuant to subsection 7–104(g)(i). The <u>actus</u> <u>reus</u> of the crime poses no problem. The problem is that of establishing criminal agency.

### The Basic Crime

On June 23, 2015, Leanne Ayers, an employee of Southern Tire in Waldorf, received a telephone call from an individual, giving his name as Brian Johnson, requesting the purchase of four Continental tires. The caller gave a credit card number over the phone and used it to charge an $85 deposit for the tires, which were to be installed the following day. On the next day, June 24, the ostensible Mr. Johnson came in and had the four tires installed on his car. After the work was completed, the purchaser used the same card number used the day before to charge the remaining balance of $939.53. Because "Mr. Johnson" did not have a physical credit card on hand, he showed his ostensible North Carolina driver's license as identifying security. Ms. Ayers took and kept a photograph of that North Carolina driver's license.

At the appellant's trial on September 8, 2016, Ms. Ayers identified the appellant as the ostensible Brian Johnson who purchased the tires from her on June 24, 2015. On cross-examination, she attested that her identification was one made with 99% certainty. It is not now challenged. It is only disparaged.

The State's second witness was Tiro Joson, who worked in the Accounts Receivable section for Southern Tire. He testified that on July 15, 2015 he received notice from the credit card company that the company was issuing a "charge back" against Southern Tire for the $1024.53 on the credit charges of June 23 and 24, 2015. The credit card number had been fraudulently used. Southern Tire immediately notified the police.

At the trial on September 8, 2016, the State also introduced, in addition to Ms. Ayers's identification of the appellant, a copy of the Maryland driver's license issued to the appellant in his proper name of Lamont Jeffery Geiger and showing his photograph. It had also introduced a copy of the ostensible North Carolina driver's license bearing the name of Brian Johnson but showing a photograph of the appellant. Judge Bragunier found as a fact that the picture of "Brian Johnson" on the North Carolina license and the picture of Lamont Jeffery Geiger on the Maryland license depicted the same man, to wit, the appellant.

On the merits, it is not without significance that the appellant did not testify and that he offered neither any witnesses nor other evidence in his defense. Judge Bragunier did not hesitate in finding that the appellant was the criminal agent in this theft of property. The case was open and shut.

### The Contentions

We have rephrased the appellate challenge as essentially the two contentions

1. that the State used inadmissible hearsay evidence in establishing that there was no legitimate North Carolina driver's license issued to a Brian Johnson; and

2. that the State used inadmissible hearsay evidence in proving that a facial recognition analysis had identified the face on the North Carolina driver's license as that of the appellant, thereby revealing the appellant's name.

**To Find Nothing Is To Discover Something**

The obvious first investigative step for Detective Matthew Kelly was to attempt to locate the "Brian Johnson" listed on the North Carolina driver's license. Ms. Ayers informed him that the picture on the license was that of the man who had purchased the tires. Accordingly, Detective Kelly presented the information on the ostensible North Carolina driver's license to the desk clerk at the Charles County Sheriff's Office. As a regular investigative resource, the Sheriff's Office has access to the databases kept by the motor vehicle administrations of various states, including that of North Carolina. With Detective Kelly looking on and supplying information, the clerk searched the North Carolina database. There had been no driver's license issued in North Carolina for a Brian Johnson with the birthdate listed on the license. The license was a fake and a theft by deception had obviously been perpetrated on Southern Tire.

The appellant's first contention grasps at straws. In the first place, he characterizes the negative information obtained from the database as inadmissible hearsay. It is not that. Maryland Rule of Procedure 5–803(b)(10) is very clear that among those things "not excluded by the hearsay rule, even though the declarant is available as a witness" is:

> (10) *Absence of Public Record or Entry*. Unless the circumstances indicate a lack of trustworthiness, <u>evidence in the form of testimony</u> or a certification in accordance with Rule 5-902 <u>that a diligent search has failed to disclose a record, report, statement, or data compilation made by a public agency</u>, or an entry therein, <u>when offered to prove the absence of such a</u>

3

<u>record or entry</u> or the nonoccurrence or nonexistence of a matter about which a record was regularly made and preserved by the public agency.

(Emphasis supplied).

The search of a database which reveals the absence of a particular record is an event to which the searcher may testify directly. The testimony "I searched and found nothing" does not involve inadmissible hearsay. It is a recognized exception to the Rule Against Hearsay.

## Detective Kelly Spoke For Himself

The appellant next tries a variation on that theme. He poses a trial scenario that Judge Bragunier did not buy and that we do not buy. The appellant insists that the search of the North Carolina database was conducted not by Detective Kelly, even in part, but by the anonymous desk clerk at the Charles County Sheriff's Department exclusively. The appellant insists that the anonymous desk clerk, as an out-of-court declarant, simply reported to Detective Kelly that the search of the North Carolina database revealed no record of a Brian Johnson and that that assertion, therefore, was the sole source of Detective Kelly's knowledge. The appellant's contention is that Detective Kelly later offered that out-of-court assertion by the desk clerk in court for the truth of the matter asserted. That, of course, would be hearsay.

As the appellant spins the story, Detective Kelly could well have been in another room. He was not. What the appellant is disinclined to accept is that the search of a database need not be a solo performance. Two or more might participate in a joint search. In a case of doubt, how many might qualify for having participated in a given search might be an

4

issue of fact to be determined by the factfinder on the basis of the totality of the pertinent circumstances. Judge Bragunier found as a matter of fact that Detective Kelly jointly participated with the anonymous desk clerk in the search of the North Carolina database and that he was, therefore, fully competent to testify about it. That finding was not clearly erroneous.

As Detective Kelly began to testify about the search of the database, appellant's counsel said that he was "going to object if there is no personal knowledge, if it's the desk clerk." Judge Bragunier asked the prosecutor to "just clear that up." The prosecutor did so.

| [PROSECUTOR]: | Now, Detective Kelly, first, let's . . . let's back up. This is the desk clerk in the Charles County Sheriff's Office station? |
|---|---|
| DETECTIVE KELLY: | That is correct. |
| [PROSECUTOR]: | Okay, and the system . . . <u>were you present at that time?</u> |
| DETECTIVE KELLY: | <u>Yes.</u> |
| [PROSECUTOR]: | Alright, <u>were you there with this desk clerk?</u> |
| DETECTIVE KELLY: | <u>Yes.</u> |
| [PROSECUTOR]: | Okay, and can you describe what specifically was being done? |
| DETECTIVE KELLY: | Um . . . their computer system is a little bit different than ours, but <u>generally if we ever have a request, we'll stand with them at the front desk and just explain what it is that we need checked. The information, we'll provide that to them</u>, and they will conduct the check and explain any findings that they have as a result of that search. |

5

| | |
|---|---|
| [PROSECUTOR]: | Okay, and this is done . . . you were . . . <u>you were seeing the results of the search?</u> |
| DETECTIVE KELLY: | <u>Yeah, I was standing with the individual at the front desk.</u> I was not monitoring every single move that they made, but <u>I stood with them.</u> |
| [PROSECUTOR]: | Okay, okay, and this system . . . this is a system that the Charles County Sheriff's Office has, where the desk clerk was -- |
| DETECTIVE KELLY: | One of the systems they utilize, yes. |
| [PROSECUTOR]: | And does it access . . . um . . . department, or vehicles, or MVA of different states? |
| DETECTIVE KELLY: | Yes. |
| [PROSECUTOR]: | Okay, and was the search that you requested and there with, was that of North Carolina? |
| DETECTIVE KELLY: | Yes. |

(Emphasis supplied).

The appellant again objected, attempting to analogize the relationship between the anonymous clerk and Detective Kelly to the relationship between the doctor who performs an autopsy and a mere observer of the autopsy. The appellant again ignored the fact that Detective Kelly and the clerk both participated in the search of the North Carolina database. The clerk's fingers may have touched the keys on the keyboard, but it was the information dictated by Detective Kelly that guided the fingers on the keyboard and that guided the inquiry. Detective Kelly testified as to what he did, what he saw, and what he knew. He was no mere conduit for the anonymous clerk. Judge Bragunier agreed:

| | |
|---|---|
| JUDGE BRAGUNIER: | Well, <u>he can testify as to what he asked her to do, and what she did, and what [he] saw.</u> |

6

(Emphasis supplied).

Detective Kelly was the indisputable source of the information that guided that search.

| | |
|---|---|
| JUDGE BRAGUNIER: | I'm going to allow him to say what he was looking for, what he . . . and what was part of the investigation. |
| [DEFENSE COUNSEL]: | Right, but the issue is, Your Honor, they're looking for something that is done out of state in North Carolina, you know? |
| JUDGE BRAGUNIER: | Okay, it's part of their investigative tools. I'm going to allow it. |
| [PROSECUTOR]: | And so there was a search made of . . . of what? |
| DETECTIVE KELLY: | The copy of the North Carolina driver's license that I was provided. |
| [PROSECUTOR]: | Okay . . . um . . . I am giving you back [the license]. Is that what you used in your search? |
| DETECTIVE KELLY: | That is correct. |
| [PROSECUTOR]: | Okay . . . um . . . what specifically? |
| DETECTIVE KELLY: | Um . . . I would have provided the front desk . . . um . . . clerk the name and the birth date of the individual, the state in which it was numbered, which is indicated near the top right side of the driver's license. |

(Emphasis supplied).

Judge Bragunier ruled that Detective Kelly was no stranger to the search of the North Carolina database and that he was competent to testify as to its negative result.

7

| [PROSECUTOR]: | And <u>were you able to confirm or get a return on Brian Johnson</u>, the individual . . . um . . . in the ID copy on State's Exhibit Five? |
|---|---|
| DETECTIVE KELLY: | <u>No.</u> |

(Emphasis supplied).

Our holding that no error was committed by Judge Bragunier is reinforced by the fact that evidentiary rulings such as this are regularly entrusted to the wide, wide discretion of the trial judge. When what is involved is a judgment call on the field, appellate courts are routinely extremely deferential.

## The Quintessence Of Harmlessness

Even if, purely <u>arguendo</u>, we were to assume that error had somehow occurred, it would be hard to conceive of an error more harmless than this. Legally sufficient proof of the fraudulent deception that the appellant practiced on Southern Tire in furtherance of his theft of four automobile tires worth over $1,000 did not in the remotest way depend on the search of the North Carolina database. The false driver's license that the appellant gave to Leanne Ayers at Southern Tire <u>ipso facto</u> established the appellant's larcenous deception beyond any reasonable doubt. It contained his picture on an ostensible North Carolina driver's license coupled with the palpably false name of Brian Johnson. That act of deception would be beyond challenge even if a North Carolina database had never existed. Once it was known that the face on the North Carolina driver's license was the face of the appellant (as the factfinding judge found it to be), all else was benignly redundant.

8

We note simply in passing that a finding of harmless error is, if anything, even easier to make in a case such as this, where there is not so much as a murmur of affirmative defense or even mitigation. It is in cases where the facts are hotly contested and where contradictory credibilities clash with one another that a trial error might readily shift the balance. In this case, nobody's credibility was even in issue. Procedural tiffs are of tamer stuff.

If any further minimization of harm were even possible, it would be in a case such as this where the verdict has been rendered not by a panel of twelve unpredictable jurors but by a veteran trial judge sitting without a jury. In assessing the possible effect of an erroneous ruling on a factfinder, a volatile jury and a legally trained and steadfast judge are very different tribunals. That difference can be a decisive factor in harmless error analysis. We cannot imagine how the appellant here could genuinely believe that Judge Bragunier's verdict would have been different if a search of the North Carolina database had never been made. Leanne Ayers's identification of him and his picture on the fake driver's license told the entire story, a story the appellant never contested. In any event, we are persuaded beyond a reasonable doubt that Judge Bragunier's verdict of guilty would not have been different if no mention of the North Carolina database had ever been made.

**Sitting In The Dock**

It is difficult to decipher just what the second contention is actually contending. As the thief drove away from Southern Tire on June 24, 2015, with $1,000 worth of stolen tires, his identity was unknown. As he sat in the dock of the Charles County Courthouse on September 8, 2016, however, the thief was indisputably identified as Lamont Jeffery

9

Geiger, the appellant. How did this change from unknown to known come about? Both the testimony of the deceived saleslady, Leanne Ayers, and the photograph on the fake driver's license the thief had used at the scene solidly established that the tire-stealing thief and the defendant in the dock were one and the same. The investigative odyssey by way of which the unknown became the known and by way of which the defendant came to be sitting in the dock, albeit narratively interesting perhaps, was legally immaterial. If the man sitting in the dock did it, we really don't need to know how he came to be sitting in the dock.

How do the police routinely discover an unknown criminal's identity? Or his whereabouts? With Elizabeth Barrett Browning, let us count the ways. Perhaps a police "hotline" receives a tip, anonymous or otherwise, from a good citizen. Perhaps the police, by cash or other inducement, pay for a tip from a snitch, to wit, a confidential informant. Perhaps the crime victim randomly spots the culprit on a crowded street or in Times Square on New Year's Eve. Perhaps the fugitive becomes an instant celebrity by winning the lottery. Perhaps it is the prescience of a Gypsy fortune-teller or the wisdom of the tea leaves. Perhaps it is just dumb luck. Or perhaps law enforcement has available to it, as does Maryland in the present case, latter-day facial profiling technology. Like Shakespeare's Cleopatra, Dame Fortune is possessed of "infinite variety" in how she points her finger at the avatar of guilt. The point is that the modus operandi just doesn't matter. Even if reading the entrails of birds is a questionable technique for identifying a suspect, a suspect thus identified most assuredly does not go free.

The law's essential indifference to such finger-pointing happenstance enjoys a long pedigree, reaching back into the first presidency of Grover Cleveland. In Ker v. Illinois,

119 U.S. 436, 7 S. Ct. 225, 30 L. Ed. 421 (1886), Ker was ultimately convicted of larceny in Chicago. Before the United States Supreme Court, he claimed that he had been denied due process of law when he was "forcibly and with violence" kidnapped from Lima, Peru and brought to stand trial in Illinois. The Supreme Court was emphatic that the due process inquiry was tightly focused within the four corners of the Illinois trial transcript and was unconcerned with the antecedent events by which Ker was brought to Illinois.

> The 'due process of law' here guarantied is complied with when the party is regularly indicted by the proper grand jury in the state court, has a trial according to the forms and modes prescribed for such trials, and when, in that trial and proceedings, he is deprived of no rights to which he is lawfully entitled.

119 U.S. at 440.

Even conceded irregularities in the antecedent procedure of the authorities would be of no avail to the defendant.

> [F]or mere irregularities in the manner in which he may be brought into custody of the law, we do not think he is entitled to say that he should not be tried at all for the crime with which he is charged in a regular indictment. He may be arrested for a very heinous offense by persons without any warrant, or without any previous complaint, and brought before a proper officer; and this may be, in some sense, said to be 'without due process of law.' But it would hardly be claimed that, after the case had been investigated and the defendant held by the proper authorities to answer for the crime, he could plead that he was first arrested 'without due process of law.' So here, when found within the jurisdiction of the state of Illinois, and liable to answer for a crime against the laws of that state, unless there was some positive provision of the constitution or of the laws of this country violated in bringing him into court, it is not easy to see how he can say that he is there 'without due process of law,' within the meaning of the constitutional provision.

Id. (Emphasis Supplied). See also Mahon v. Justice, 127 U.S. 700, 715, 8 S. Ct. 1204, 32 L. Ed. 283 (1888); Lascelles v. Georgia, 148 U.S. 537, 544, 13 S. Ct. 687, 37 L. Ed. 549

11

(1893) ("The jurisdiction of the court in which the indictment is found is not impaired by the manner in which the accused is brought before it."); Ex parte Johnson, 167 U.S. 120, 126, 17 S. Ct. 735, 42 L. Ed. 103 (1897) ("[I]n criminal cases a forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court.").

That venerable principle that a trial of a defendant will not be compromised by the manner in which the defendant was brought before the court for trial has been consistently reaffirmed. In Frisbie v. Collins, 342 U.S. 519, 72 S. Ct. 509, 96 L. Ed. 541 (1952), the defendant was convicted of murder in Michigan "after Michigan officers forcibly seized, handcuffed, blackjacked and took him to Michigan" in clear violation of the Federal Kidnapping Act. 342 U.S. at 520. The Supreme Court held unanimously that the manner in which Michigan acquired the person of the defendant and brought him to trial did not adversely affect the propriety of the trial itself.

> This Court has never departed from the rule announced in Ker v. Illinois . . . , that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

342 U.S. at 522 (emphasis supplied).

12

In United States v. Crews, 445 U.S. 463, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980), the Supreme Court again reaffirmed this principle.

> Insofar as respondent challenges his own presence at trial, <u>he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest.</u> An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction. . . . <u>Respondent is not himself a suppressible "fruit," and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt</u> through the introduction of evidence wholly untainted by the police misconduct.

445 U.S. at 474 (emphasis supplied). <u>See also New York v. Harris</u>, 495 U.S. 14, 18, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990) ("There could be no valid claim here that Harris was immune from prosecution because his person was the fruit of an illegal arrest.").

The thinking of this Court is completely in line with that of the Supreme Court. The appellant in <u>Modecki v. State</u>, 138 Md. App. 372, 771 A.2d 521 (2001), brought the challenge that it was his illegal arrest that led to "the discovery of his identity," something "the police would otherwise not have been aware of." 138 Md. App. at 378. In rejecting that challenge, Judge Bloom concluded:

> <u>In accordance with Justice Brennan's opinion in *Crews*, we hereby hold that neither appellant's person nor his identity was a "fruit" of his detention that would be subject to suppression even if that detention was unlawful.</u> . . . The evidence used to convict him was wholly untainted by that seizure and detention.

138 Md. App. at 380 (emphasis supplied).

What the appellant argues for is something not generally cognizable at law—a "but for" chain of impermissible causation. "But for some questionable procedure or unsubstantiated step taken by the investigators, they would never have found me and I,

13

therefore, would not be here in court." There is, of course, no such thing as a viable "but for" defense. There is no right not to be identified. Confronted with such "but for" reasoning, the police could never, for instance, bridge such a gap in the investigative chain as that posed by an anonymous telephone tip or by the fingering of the suspect by an undercover "mole."

## Proceeding On "Information Received"

The arrival of this appellant at the trial table in Charles County involved nothing so melodramatic as having been kidnapped from Lima, Peru. In terms of identifying and apprehending the thief, Detective Kelly had nothing to go on except the North Carolina driver's license. After he testified about the search of the North Carolina database that established that it was a fake, he was asked to describe his next investigative move.

| [PROSECUTOR]: | Is there anything else that you did in terms of this investigation? |
|---|---|
| DETECTIVE KELLY: | Yes. I made contact with . . . a crime analyst, Mr. Rodriguez . . . , who works in conjunction with our office, and I provided him with the photo that I had obtained from the driver's license. <u>He entered that into</u> -- |
| [DEFENSE COUNSEL]: | Your Honor, this is where <u>I am going to object.</u> |
| [PROSECUTOR]: | And <u>I'm fine with that.</u> |
| JUDGE BRAGUNIER: | Okay. |

(Emphasis supplied).

Into what black hole that "photo" disappeared we might never know, for Detective Kelly never finished his sentence. When defense counsel objected, the State immediately

14

agreed not to pursue the matter further. In a situation such as this, in order to allow an officer to narrate what his next investigative step was but yet to avoid the danger of possibly prejudicial hearsay, the law is clear that the investigator should simply be permitted to say that he took the next step "upon information received." As explained in McCormick on Evidence, Sect. 246, at 587 (Edward W. Cleary ed. 2d ed. 1972):

> In criminal cases, the arresting or investigating officer will often explain his going to the scene of the crime or his interview with the defendant, or a search or seizure, by stating that he did so "upon information received" and this of course will not be objectionable as hearsay.

(Emphasis supplied).

In Parker v. State, 408 Md. 428, 446, 970 A.2d 320 (2009), Judge Adkins wrote for the Court of Appeals:

> In permitting McGowan to explain why he was working at the 1200 block of Laurens Street, the court should have allowed McGowan to say only that he was there "based 'on information received.'"

(Emphasis supplied). See also Graves v. State, 334 Md. 30, 39–40, 637 A.2d 1197 (1994).

At that point in the direct examination of Detective Kelly, the State took precisely that direct and summary approach recommended by the law.

| [PROSECUTOR]: | Was a suspect developed? |
|---|---|
| DETECTIVE KELLY: | Yes. |
| [DEFENSE COUNSEL]: | Objection, Your Honor. |
| JUDGE BRAGUNIER: | Overruled. |

(Emphasis supplied).

15

"Upon information received," Detective Kelly went to the Maryland Department of Motor Vehicles and obtained a copy of the driver's license of the appellant. We need not inquire further into the "information received" because it might be hearsay injurious to the defendant. That is exactly the protocol by which these things are supposed to be done. Ironically, it was the appellant himself who then inquired further into of what the "information received" consisted. If the revelation offended him, he had but himself to blame.

> [DEFENSE COUNSEL]: Your Honor, I would like to be heard on that. I'd like to be heard on that, Your Honor?
>
> JUDGE BRAGUNIER: Okay?
>
> [DEFENSE COUNSEL]: Your Honor, based on this technology that the officer is relying on, there's several matches that come up. This technology spits out several matches. We don't know how this match came about. We don't know who the other people were.
>
> JUDGE BRAGUNIER: I don't know either[.]
>
> [DEFENSE COUNSEL]: Right, and it's unfair . . . for this officer to testify that this gentleman came up among others. [W]ho else came up?
>
> JUDGE BRAGUNIER: Well, I don't . . . know. I haven't heard the evidence[.]

(Emphasis supplied).

It was the State that argued that how the appellant came to be a suspect was irrelevant. Judge Bragunier agreed.

> [PROSECUTOR]: [F]rankly the fact that a suspect was developed . . . the reason, or the way how the suspect was developed, is irrelevant.

16

| | |
|---|---|
| JUDGE BRAGUNIER: | That's <u>all that she asked</u>[.] . . . [W]<u>as a suspect developed, and the answer was yes.</u> Now, we'll ask another question. |

(Emphasis supplied).

## Facial Profiling Technology

After several brief questions, not here pertinent, the State prepared to turn Detective Kelly over to the defense for cross-examination. The State offered in evidence a copy of the Maryland driver's license of the appellant. In protesting vigorously, the appellant again reverted, this time in lurid detail, to the facial profiling technology that the State had never mentioned.

| | |
|---|---|
| [DEFENSE COUNSEL]: | Your Honor, I'm going to object to the identification or the Motor Vehicle photo of Mr. Geiger coming in. Again, . . . <u>that photo identification was generated using unproven technology</u>. |
| | <u>That technology is not certified or authorized in any state in this country, as well as the federal . . . government.</u> Those kind of searches and the results that are generated from them are not accepted anywhere, <u>nor is the technology accepted anywhere.</u> |

(Emphasis supplied).

Judge Bragunier explained that the defendant "doesn't have a right to protect his image." Defense counsel nonetheless went on, making for the first time an express reference to "facial recognition technology" and describing the process in some detail.

| | |
|---|---|
| [DEFENSE COUNSEL]: | But <u>we don't have the other images.</u> . . . [T]hat's the frustrating thing here. <u>They generate a search</u> |

17

|  | that's supposed to spit out several images, and they just present you with one.
|  |
|  | I can see if there was a photo array where there were six or seven other individuals that were produced as a result of this search, then you know, I would feel more comfortable. But if you give us one image, we don't know where the other ones were, and we're saying, "Well, this is indeed the guy." And that's a little bit unfortunate for my client.

JUDGE BRAGUNIER: Well, he's not . . . this witness isn't saying that.

[DEFENSE COUNSEL]: No, but he is talking about what somebody else ran through a machine, what somebody else ran through . . . some facial recognition technology. So, we're getting . . . evidence that was generated by two other individuals. One was a desk clerk at the Charles County Sheriff's office and the other one was an investigator . . . from who knows where?

(Emphasis supplied).

Facial profiling technology is a new weapon in the investigative arsenal, but it is one increasingly familiar to any aficionado of modern-day detective dramas on television. A photograph of a face, such as the one from the fake North Carolina driver's license in this case, is fed into the system. The system then compares that photograph with the thousands or even millions of known faces already in the system, as it searches for a counterpart. It is akin to computerized searching for identical fingerprints. Precisely how the computer does this is something well beyond our ken. There is no suggestion, however, that these computerized identification methodologies are not now perfectly reliable investigative tools.

18

Reliability does not matter, however, because the computerized identification is not ultimately evidence in court. It is simply a guide to put the investigator on the right track. The only evidentiary identification that mattered was the one-on-one identification made in the courtroom between the face on the fake North Carolina driver's license and the face on the appellant's known Maryland driver's license or, perhaps, the comparison between the face on the fake North Carolina driver's license and the face of the defendant sitting in the dock. That was the evidence that was before Judge Bragunier in her factfinding capacity. She was never asked to rely upon the computerized identification. How Detective Kelly found his way to the appellant's Maryland driver's license, therefore, was immaterial. That license spoke for itself.

Detective Kelly himself did not testify in any way about facial profiling technology. The State never questioned him about such technology. Information about facial profiling technology, against which the appellant rails now as fatally contaminating, did not come from the mouth of Detective Kelly. It came only from the mouth of defense counsel. The entire subject was mentioned only by defense counsel in the course of arguing to the court. If Judge Bragunier was influenced by repeated references to such technology, it was defense counsel who did the referencing. The State never mentioned the subject.

Instead of allowing Detective Kelly to proceed, as the law clearly directs, on the basis of "information received," defense counsel continued to insist that there must be a full explanation as to how the "information received" was generated and by whom.

> [DEFENSE COUNSEL]: So, Your Honor . . . Your Honor, <u>he has no personal knowledge, nor can he tell the Court how</u>

19

> he generated this information, he can only rely on what somebody else did.
>
> And that's where we are today, it's just . . . there is no link, no connection. Nobody is testifying as to how that information was generated. The State is just giving you a picture of a Motor, you know, a Motor Vehicle picture and saying, "Well, you know, this is what he did." And we don't have all the other pictures that were generated.

(Emphasis supplied).

The State replied, "The way that the suspect was developed in this case is completely irrelevant." Judge Bragunier agreed with the State and overruled appellant's objection. In this, we see no error. Every mention of facial profile technology was made by the appellant and not by the State. Virtually every even indirect allusion to it was made by the appellant and not by the State. Only a trial judge, of course, can commit reversible error, and the appellant does not identify any ruling by Judge Bragunier that constitutes reversible error. All we have is undifferentiated angst.

## Harmless Error Redux

Even if, again purely arguendo, Judge Bragunier committed some conceivable error in dealing with how Detective Kelly came to locate the appellant, such presumptive error would have been transcendently harmless. We are persuaded beyond a reasonable doubt that even if Judge Bragunier had never had an inkling as to how Detective Kelly had been led to the appellant's Maryland driver's license, her verdict of guilty would have been precisely the same.

## A Reader's Guide To Zemo v. State

This brings us to <u>Zemo v. State</u>, 101 Md. App. 303, 646 A.2d 1050 (1994), and the appellant's heavy reliance on it. The appellant objects to Detective Kelly's testimony at two different levels, and we will respond with respect to each. At the initial admissibility level, the appellant objected to the admissibility of the search made of the North Carolina database that revealed that the driver's license used by the appellant to perpetrate his theft by deception had been a fake. In addition to contending that the search of the database had been conducted by the clerk of the Charles County Sheriff's Office acting alone and not in conjunction with Detective Kelly, the appellant, in reply brief, argues strenuously that the search violated the Rule Against Hearsay:

> <u>In order for the hearsay exception to apply, Md. Rule 5-803(b)(10) requires "testimony or certification in accordance with Rule 5-902</u> that a diligent search has failed to disclose a record[.]" However, <u>there was no such testimony or certification in this case.</u> Here, Det. Kelly testified that he gave the copy of the driver's license to a desk clerk at the police station. He explained that desk clerks have access to a different computer system than he does, and that "[t]he information, we'll provide that to them, and they will conduct the check and explain [] any findings that they have as a result of that search." This testimony does not establish that a "diligent search" was conducted, as required by Md. Rule 5-803(b)(10). Additionally, <u>Det. Kelly's testimony that he was "standing with the individual at the front desk,"</u> and "I was not monitoring every single move that they made," <u>is not equivalent to Det. Kelly conducting the search himself</u>, particularly when he testified that "their system is a little different than ours[.]"

(Emphasis supplied).

We have fully answered that contention <u>supra</u> under the subheads "To Find Nothing Is To Discover Something" and "Detective Kelly Spoke For Himself."

At that same initial admissibility level, the appellant, strenuously and at great length, objected to the fact that the use of the facial profiling technology had led to the

21

identification by Detective Kelly of the appellant. Objection was made to the fact that the identification was based on "unproven technology."

> [DEFENSE COUNSEL]: Your Honor, I'm going to object to the identification of the Motor Vehicle photo of Mr. Geiger coming in. Again, . . . <u>that photo identification was generated using unproven technology.</u>
>
> <u>That technology is not certified or authorized in any state in this country,</u> as well as the federal . . . government. Those kind of searches and the results that are generated from them are not accepted anywhere, <u>nor is the technology accepted anywhere.</u>

(Emphasis supplied).

At one point, the objection seemed to wander mysteriously into the world of constitutional identification law, as if challenging the impermissible suggestiveness of a photographic array.

> [DEFENSE COUNSEL]: But we don't have the other images. . . . [T]hat's the frustrating thing here. <u>They generate a search that's supposed to spit out several images, and they just present you with one.</u>
>
> I can see <u>if there was a photo array where there were six or seven other individuals that were produced as a result of this search,</u> then you know, <u>I would feel more comfortable.</u> But if you give us one image, we don't know where the other ones were, and we're saying, "Well, this is indeed the guy." And that's a little bit unfortunate for my client.

(Emphasis supplied).

The objection then reverts to the hearsay theme that Detective Kelly had no personal knowledge but was simply passing on the work product of someone else, who did not testify.

> [DEFENSE COUNSEL]: Your Honor, <u>he has no personal knowledge, nor can he tell the Court how he generated this information, he can only rely on what somebody else did.</u>
>
> And that's where we are today, it's just . . . there is no link, no connection. <u>Nobody is testifying as to how that information was generated.</u> The State is just giving you a picture of a Motor, you know, a Motor Vehicle picture and saying, "Well, you know, this is what he did." And <u>we don't have all the other pictures that were generated.</u>

(Emphasis supplied).

We have fully answered that contention <u>supra</u> under the subheads "Sitting In The Dock," "Proceeding On 'Information Received,'" and "Facial Profiling Technology."

In an unusual appellate maneuver, the appellant, without expressly abandoning these more directly substantive objections, backs up and makes a run at Detective Kelly's testimony from an entirely different direction, relying completely on this Court's <u>Zemo v. State</u>. The argument is that by allowing Detective Kelly to testify about investigative steps he took that were irrelevant, Judge Bragunier erroneously allowed the State, by offering extraneous corroboration of his irrelevant findings, to bolster Detective Kelly's credibility.[1] The defense brief recites:

---

[1] Detective Kelly's credibility was never challenged in any respect and did not seem to be in any need of bolstering.

23

> In Zemo, the details of the detective's investigation had no bearing on the issue of guilt or innocence. Instead, the prosecution improperly used those details to bolster the witness's belief that the defendant was involved in the crime.
>
> This case is similar to Zemo. Here, Det. Kelly testified about the investigative steps he took, including whom he spoke to and why he spoke to them, that ultimately led him to Mr. Geiger—the sole suspect. Det. Kelly testified about a "driver's license check" run by a "desk clerk" and about how crime analyst, Mr. Rodriguez, "entered" the photo and developed Mr. Geiger as a suspect. Here, as in Zemo, Detective Kelly "vicariously imparted cryptic reports from unnamed sources off-stage, who would never appear before a live audience."

(Emphasis supplied).

Relying totally on Zemo, the appellant's argument goes on to argue that these irrelevant sources served to corroborate Detective Kelly's conclusion that the appellant was guilty.

> Det. Kelly's testimony regarding the details of his investigation had no relevance other than [to] bolster the accuracy of Det. Kelly's development of Mr. Geiger as a suspect. The statements by the unnamed desk clerk to Det. Kelly regarding the lack of search results in the North Carolina MVA database and Mr. Rodriguez's statements to Det. Kelly indicating that the individual depicted in the driver's license photograph after Mr. Rodriguez "entered" the driver's license photograph were hearsay statements analogous to the statements made by the confidential informant to the investigating detective in Zemo.
>
>> The only possible import of such testimony was to convey the message that the [computer search results] 1) knew who committed the crime, 2) [were] credible, and 3) implicated the appellant. Both the confrontation clause and the rule against hearsay scream out that the appellant was denied any opportunity to confront that confidential accuser.

101 Md. App. at 306. Here, Det. Kelly's testimony about the digital search results that pointed the finger at Mr. Geiger conveyed to the factfinder (the trial court) that they must have gotten it right. Moreover, like in Zemo,

24

neither the computer programs nor those who operated them were available for cross-examination.

(Emphasis supplied).

In reply brief, the appellant took special umbrage at the fact that "the State never acknowledge[d] Zemo in its brief." The appellant wants his case to be a clone of Zemo.

The vexing problem the appellant has with Zemo, however, is that Zemo does not stand for the proposition for which the appellant cites it. There is, to be sure, one peripheral similarity between the two cases. The appellant has constructed his thesis based on that one peripheral similarity. The appellant's focus in this case is on the testimony of Detective Kelly describing his investigation. This Court's focus in Zemo, leading to a reversal of a conviction, was on the testimony of Detective Augerinos describing his investigation. At that point, however, all similarity between the two cases has come to an end.

Our focus must shift from the periphery to the core. The actual focus in Zemo was not on the detective's testimony describing his investigation per se. It was on the fact, rather, that the detective, by virtue of unduly extensive and, in that case, totally irrelevant testimony about his investigative procedures, introduced into the case two highly prejudicial pieces of information against the defendant. The first was that the defendant invoked his right to silence in a case where his silence was not admissible.

> Detective Augerinos was permitted to testify that he gave the appellant Miranda warnings and that the appellant, following those warnings, chose to remain silent. There was no legitimate purpose for that testimony. The appellant never took the stand and there was no arguable way in which his silence could have been used for impeachment purposes. Post-Miranda silence, moreover, has no legitimate relevance or probative value.

25

101 Md. App. at 305 (emphasis supplied). We went on to explain the possible prejudice accruing from that inadmissible testimony.

> Even laymen can figure out that when one is privileged not to respond because of self-incrimination, it is because the response, if unprivileged, would be incriminating. Because of the natural (and by no means illogical) tendency to equate silence with guilt, the Constitution in many circumstances, including the one at bar, forbids even mentioning, and thereby drawing attention to, such silence. Flouting the constitutional taboo, attention was drawn to the appellant's silence in this case.

101 Md. App. at 316 (emphasis supplied).

The other inadmissible but damning evidence was reference to a confidential informant and to the gratuitous corroboration of many of the incriminating details of the story told by the confidential informant, bolstering the informant's conclusion as to Zemo's guilt.

> He testified, over objection, that he received evidence about the crime from a confidential informant, that the informant's information put him on the trail of the appellant and other suspects, that other parts of the informant's information were corroborated and turned out to be correct, and that, acting on the informant's information, he arrested the appellant. The only possible import of such testimony was to convey the message that the confidential informant 1) knew who committed the crime, 2) was credible, and 3) implicated the appellant. Both the confrontation clause and the rule against hearsay scream out that the appellant was denied any opportunity to confront that confidential accuser.

101 Md. App. at 306 (emphasis supplied).

The present case and Zemo are diametrically different in that the invocation of the right to silence in Zemo and the detailed corroboration of information from the confidential informant in Zemo were both completely inadmissible and highly prejudicial. In this case, by stark contrast, 1) the information that the North Carolina license presented to the theft

26

victim was a fake and 2) the identification of the anonymous thief as the appellant were both highly relevant matters as to which evidence would have been admissible. What Detective Augerinos introduced in <u>Zemo</u>, by contrast, was irrelevant and inadmissible. What Detective Kelly introduced was properly in the present case. The contrast between the two cases is one of 180°.

The dissimilarity between this case and <u>Zemo</u> does not end there. An even more significant difference between this case and <u>Zemo</u> is one that engages the very ABCs of "How To Read An Appellate Opinion 101." <u>Stare decisis</u> does not consist of plucking a lyric phrase here or there from the low-hanging fruit. Nor does it consist even of taking a succulent looking sentence out of its constraining context. The auditor must make a genuine search for the central thrust of a decision because therein lies the only locus of precedential authority.

A genuine reading of <u>Zemo</u> makes clear that the State's error that led to the reversal of the conviction in that case consisted not simply of the introduction of two items of significantly prejudicial evidence against the defendant, but in the deliberate and protracted fashion in which it was done. We announced at the very outset of our opinion that the dispositive flaw lay not simply in the State's introduction of inadmissible and prejudicial material but in having done so deliberately and repeatedly.

> In combination, moreover, [the errors] reveal <u>an instance of prosecutorial "overkill,"</u> wherein the State, not by passing or careless reference but <u>by a sustained line of inquiry</u>, sought to "milk" the testimony of Detective Augerinos for far more than it was legitimately worth.

27

101 Md. App. at 305 (emphasis supplied). Our opinion developed at length the extent to which the State exploited the wide-ranging exploitation of extrinsic evidence.

> Over the course of the first eighteen of those pages, Detective Augerinos described his physical observations of the method of entry into the buildings, of the damage done to the vending machines that were broken open, and of the unsuccessful effort to drill into the floor safe. He was the key witness to the corpus delicti of the crime.
>
> . . . .
>
> At that point, however, Detective Augerinos's role in the drama was concluded, and it was time for him to depart the stage. Instead, he remained on center-stage for an additional fifteen pages of transcript, recounting events as to which he had no direct knowledge and which were themselves without relevance. Once he had, in the trial's opening scene, established the corpus delicti of the crime, it was then for other players to develop the appellant's unfolding complicity.
>
> . . . .
>
> Detective Augerinos, nonetheless, lingered on stage almost in the role of a Greek Chorus. He vicariously imparted cryptic reports from unnamed sources off-stage, who would never appear before the live audience.

101 Md. App. at 307 (emphasis supplied).

Our critical focus in Zemo was on the pivotal difference between an inadvertent error or even a purposeful but fleeting error, on the one hand, and a deliberate and sustained exploitation of repeated error, on the other hand. The deliberate and quantitative factor was significant.

> The taboo reference to the silence here was obviously no inadvertent lapse by a careless witness nor even a gratuitous little bonus tossed in by a more clever witness. Such evidentiary missteps are little more than ordinary trial static. The harkening to the sound of silence on this occasion was, by contrast, the very end sought by this entire phase of the examination.

101 Md. App. at 315 (emphasis supplied).

28

In dramatic contrast to the bravura performance of Detective Augerinos in <u>Zemo</u>, as he played the role of what <u>Zemo</u> called a "Greek chorus" in narrating the full unfolding of the prosecution's case, 101 Md. App. at 307, Detective Kelly's testimony about the search of the North Carolina database in this case was becomingly brief and modest. The appellant refers to this testimony's having happened over the course of six pages of the trial transcript. We have examined these pages and find that this phase of the State's case did, indeed, stretch over 129 lines of transcript. Detective Kelly, however, only got to speak 39 of those lines and seven of those 39 lines consisted only of a monosyllabic "Yes" or "No." The rest was procedural wrangling among the defense attorney, the prosecuting attorney, and the trial judge. Detective Kelly sat quietly and modestly in the eye of that forensic hurricane. No Greek chorus was he. This quantitative analysis, moreover, is one above and beyond the other disparity that Detective Kelly's testimony in this case was admissible whereas Detective Augerinos's testimony in <u>Zemo</u> was inadmissible.

With respect to the State's use of facial profiling technology, to any insight into how such technology works, or to the significance of any identification made by the technology, Detective Kelly was interrupted in mid-sentence almost before he began.

| [PROSECUTOR]: | Is there anything else that you did in terms of this investigation? |
|---|---|
| DETECTIVE KELLY: | Yes, I made contact with . . . a crime analyst, Mr. Rodriguez . . . [,] who works in conjunction with our office, and <u>I provided him with the photo</u> that I had obtained from the driver's license. <u>He entered that into</u> – |
| [DEFENSE COUNSEL]: | Your Honor, <u>this is where I am going to object.</u> |

29

> [PROSECUTOR]:     <u>And I'm fine with that.</u>
>
> JUDGE BRAGUNIER:     <u>Okay.</u>

(Emphasis supplied).

No Greek chorus was ever so effectively silenced. Detective Kelly never even got to mention the name or the subject of facial profiling technology or to describe its modality in any way. That all came exclusively from the argument of defense counsel and may not now be attributed to the State. The appellant attempts to knock down a straw man of his own making. The testimony of Detective Augerinos in <u>Zemo</u> and of Detective Kelly in this case are in no way analogues of each other. The appellant's reliance on <u>Zemo</u> is completely inapt.

That inapt reliance is ironic in that <u>Zemo</u>, in its opening paragraphs, went out of its way to caution against such an over-reading of its factual scenario. Under the subhead of "Random Error Versus Sustained Error," <u>Zemo</u> even provided a reader's guide as to **HOW NOT TO READ THE OPINION**.

> As we begin to examine the tainted testimony of Detective Augerinos, it is important to note what we are **<u>not holding</u>** and what we are **<u>not even suggesting</u>**.

101 Md. App. at 306 (emphasis in original).

<u>Zemo</u> then went on to amplify that admonition and to emphasize precisely what it meant by the use of those words.

> <u>We are not counseling an overreaction to every passing or random injection of some arguably prejudicial material into a trial.</u> A few smudges of prejudice here and there can be found almost universally in any trial and need to be assessed with a cool eye and realistic balance rather than with the fastidious over-sensitivity or feigned horror that sometimes characterizes defense

30

protestations at every angry glance. We are not talking about the expected cuts and bruises of combat. <u>What we are objecting to in this case, rather, is a sustained and deliberate line of inquiry that can have had no other purpose than to put before the jury an entire body of information that was none of the jury's business.</u> We are not talking about a few allusive references or testimonial lapses that may technically have been improper. <u>We are talking about the central thrust of an entire line of inquiry. There is a qualitative difference.</u> Where we might be inclined to overlook an arguably ill-advised random skirmish, <u>we are not disposed to overlook a sustained campaign</u>.

<u>Id</u>. (Emphasis supplied).

In relying, as he does, almost exclusively on <u>Zemo</u>, the appellant cites <u>Zemo</u> for a message that <u>Zemo</u> affirmatively disavowed. It would ill behoove the appellant, moreover, to tell the Court that wrote <u>Zemo</u> what it was that <u>Zemo</u> meant to say. We affirm the conviction.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**

31