*Ashlee Nicole Scott v. State of Maryland*, No. 853, September Term, 2024. Opinion by Lazerow, J.

**CRIMINAL LAW – SUFFICIENCY OF THE EVIDENCE – ACCOMPLICE LIABILITY**

Accomplice liability manifests in two ways: *first*, responsibility for the principal offense, and *second*, responsibility for other criminal acts incidental to the commission of the principal offense.

To establish a defendant's responsibility for the principal offense, the State must prove that the accused participated in the offense either as a principal in the second degree or as an accessory before the fact. To establish a defendant's responsibility for other criminal acts that are incidental to the commission of the principal offense, the State must prove that (i) the accused participated in the principal offense either as a principal in the first degree, a principal in the second degree, or as an accessory before the fact; and (ii) the charged offense was done in furtherance of the commission of the principal offense or the escape therefrom.

Here, the evidence was sufficient to establish that Appellant was a principal in the second degree to the robbery—and was thus responsible for the principal offense—where Appellant (i) aided, counseled, commanded, and encouraged the commission of a robbery by instructing her housemate to lure the victims outside of a home, and then replacing her housemate with another housemate when the first housemate refused to participate; and (ii) was actually present when the robbery was committed.

The evidence was also sufficient to establish that the shooting and assaults perpetrated after the robbery were done in furtherance of the commission of the robbery or the escape therefrom, where a housemate shot a victim of the robbery after the victim broke free from another housemate.

**CRIMINAL LAW – SUFFICIENCY OF THE EVIDENCE – CONSTRUCTIVE POSSESSION**

Possession of a firearm may either be actual or constructive, exclusive or joint in nature. Here, applying the factors from *Folk v. State*, 11 Md. App. 508, 518 (1971), the evidence supported Appellant's firearm convictions under a theory of constructive possession. *First*, Appellant was close to the firearm: Appellant entered their shared residence with the shooter, witnessed the firearm being hidden in a couch cushion, and was in a room adjacent to the couch. *Second*, Appellant had knowledge of the firearm: Appellant discussed the existence of the firearm and the need to hide it. *Third*, Appellant had a possessory right in the premises where the firearm was found: Appellant lived in the basement of the residence outside of which the firearm was discovered. And *fourth*, Appellant was participating with

others in the mutual use and enjoyment of the firearm: Appellant jointly participated in a robbery, during which a firearm was brandished and discharged.

**CRIMINAL LAW – JURY INSTRUCTIONS – ACCOMPLICE LIABILITY**

A *Mumford*-type instruction—which instructs the jury, in felony murder cases, that they must find a causal connection between the felony and the killing, and that if the killing was independent and not in furtherance of the felony, the defendant cannot be held liable for that killing, *see Mumford v. State*, 19 Md. App. 640 (1974)—does not apply in accomplice liability cases.

**CRIMINAL LAW – CONFRONTATION CLAUSE – HEARSAY**

Statements offered not to prove the truth of the matter asserted but to explain briefly the steps law enforcement took during its investigation are not hearsay, and their admission thus does not implicate Confrontation Clause principles.

Circuit Court for Wicomico County
Case No. C-22-CR-23-000449

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 853

September Term, 2024

_____

ASHLEE NICOLE SCOTT

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Berger,
Lazerow, Alan C.
    (Specially Assigned),

JJ.

_____

Opinion by Lazerow, J.

_____

Filed: December 17, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# INTRODUCTION

A jury sitting in the Circuit Court for Wicomico County convicted Ashlee Nicole Scott (the "Appellant") of twenty-three counts stemming from her involvement in an August 2023 assault, robbery, and shooting in Salisbury, Maryland. Of the twenty-three counts, the State's theory was that Appellant was culpable as an accomplice for twenty of those counts, including attempted murder, robbery, firearms, assault, and related charges. The trial court gave an accomplice liability instruction as to those charges. The jury also convicted Appellant of conspiracy to commit robbery and two counts of possession of a firearm by a prohibited person. The trial court sentenced Appellant to fifty years' imprisonment.

Appellant presents three questions for our review, which we have rephrased as follows[1]:

    I.       Whether there was sufficient evidence to support Appellant's convictions based on the State's respective theories of accomplice liability and constructive possession.

    II.      Whether the trial court erroneously instructed the jury on accomplice liability.

---

[1] Scott phrased the questions as follows:

    I.      Whether the evidence was insufficient to support Ms. Scott's convictions?

    II.      Whether the instruction to the jury on accomplice liability was erroneous?

    III.      Whether the court violated Ms. Scott's confrontation right by admitting evidence of a non-testifying co-defendant's custodial statement to police regarding the location of the gun?

III.     Whether the trial court violated Appellant's confrontation rights by admitting the custodial statements of a non-testifying co-defendant.

Finding no error, we affirm.

**<u>BACKGROUND</u>**

In April 2024, Appellant was tried before a jury on twenty-five charges, including attempted murder, robbery, firearms, assault, and related charges. The jury convicted Appellant of twenty-three of those charges, with the trial court granting Appellant's motion for judgment of acquittal as to one count of conspiracy to commit armed robbery and the State nol prossing one count of use of a firearm in the commission of a crime of violence. The State called ten witnesses to testify in its case. This evidence, taken in the light most favorable to the State, *see, e.g.*, *State v. Smith*, 374 Md. 527, 533 (2003), established the following:

Appellant, along with her housemates—Joshua Satchell, Deverick Bivens, and Jeremiah McCullough—planned to commit a robbery. Their plan involved asking another housemate, Ashley White, to accompany them to 403 Elizabeth Street in Salisbury and to lure certain men outside the home. Once the men were "bait[ed]" outside, the group intended to rob them.

On August 20, 2023, the plan was executed: McCullough instructed White to prepare and await further instructions from Appellant. Appellant then directed White to put on a "pretty black dress" and try to lure the group of men out of the 403 Elizabeth Street residence so that Appellant, Satchell, Bivens, and McCullough could "take care of the rest." White declined, stating that she was good friends with the men, after which Appellant indicated that Deneice Ellis, another housemate, would assist in the plan instead.

2

At around 3:00 p.m., Satchell approached a group of men barbequing in the backyard of 403 Elizabeth Street—Javier Duarte-Aleman, Daniel Rivera Penaloza, Jose Alfredo Villanueva Lozano, Ismael Martinez Penaloza, and Juan Jesus Rivera Sanchez. Satchell offered the men a cigar or marijuana, along with "the service of ladies." The men promptly declined.

Shortly before 11:00 p.m. that same night, Satchell returned to the backyard of 403 Elizabeth Street with Ellis and Appellant. Satchell again offered the "services" of Appellant and Ellis. The men declined and requested that the trio leave. Satchell, Ellis, and Appellant then walked approximately twenty to thirty yards away but remained on the property.

About ten minutes later, Bivens and McCullough joined the trio and again approached the men, demanding money and initiating a physical altercation: Satchell grabbed Duarte-Aleman, and McCullough grabbed Villanueva Lozano. During the altercation, Bivens displayed a firearm and pointed it at the group of men. As Duarte-Aleman broke free of Satchell and began to enter the back door of the residence, Bivens shot him in the back of the neck. While Duarte-Aleman lay on the ground, unable to move the lower portion of his body, one of Appellant's co-defendants took 300 dollars from his wallet.

Shortly after the shooting, while walking home from the laundromat with her cousin, White observed Appellant, Satchell, McCullough, Bivens, and Ellis running between houses and in alleys towards their shared residence at 322 Naylor Street. By the

3

time White arrived at the residence, Appellant, Satchell, McCullough, Bivens, and Ellis were already in the basement, in Appellant's bedroom.

While White was in the basement common area, she heard shushing and discussions between Appellant, Satchell, McCullough, Bivens, and Ellis. White heard "something along the lines of it not being enough money," stating that "[Appellant] was asking where he had put [the firearm]. And it was in a couch cushion, I believe." White further testified that "they were trying to say they were going to take it from a couch cushion and place it in the alley or something, or hide it in the alley, something . . . like that."

Detective Isaiah Barkley interviewed the witnesses and reviewed nearby surveillance cameras. On September 12, 2023, during his interview of and based on conversations with Satchell, Detective Barkley directed Detective Miller to search the alley outside 322 Naylor Street for a revolver wrapped in a t-shirt. Detective Miller located a revolver—rusted but appearing operable—wrapped in a t-shirt. Detective Miller did not test the revolver due to safety concerns, but observed two spent shell casings inside the revolver.

## DISCUSSION

## I. THE EVIDENCE WAS SUFFICIENT TO SUPPORT APPELLANT'S CONVICTIONS

Appellant contends that the evidence was insufficient to support the State's theories of accomplice liability—without making specific arguments about specific counts—and constructive possession of the revolver. The State, on the other hand, argues that the State's

4

proof provided a basis on which the jury could reasonably conclude that Appellant was (i) an accomplice and (ii) a prohibited person who constructively possessed a firearm.

## A. STANDARD OF REVIEW

"The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith*, 374 Md. at 533. For that reason, our only inquiry "is 'whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.'" *O'Sullivan v. State*, 476 Md. 602, 621 (2021) (quoting *State v. Manion*, 442 Md. 419, 431 (2015)).

Indeed, the reviewing court does not consider whether it believes "that the evidence at the trial established guilt beyond a reasonable doubt." *Manion*, 442 Md. at 431. Instead, deference is given to "a trial judge's or a jury's ability to choose among differing inferences that might possibly be made from a factual situation[.]" *Id.* (quoting *Smith*, 374 Md. at 534). "Where it is reasonable for a trier of fact to make an inference, we must let them do so, as the question is not whether the trier of fact could have made other inferences from the evidence or even refused to draw any inference, but whether the inference it did make was supported by the evidence." *State v. Suddith*, 379 Md. 425, 447 (2004) (cleaned up).

5

**B.     A SUFFICIENT FACTUAL BASIS EXISTED TO SUPPORT APPELLANT'S CONVICTIONS UNDER A THEORY OF ACCOMPLICE LIABILITY**

Appellant argues that the evidence was insufficient to sustain her convictions under a theory of accomplice liability. Appellant concedes that "there was evidence that she was part of a discussion involving what could be construed as a theft or a robbery," but maintains that the evidence was insufficient to establish "any of the crimes pursued under an accomplice liability theory." Specifically, Appellant asserts that "there is no evidence that [Appellant] committed the acts outside of [participating in] the original conversation, arriving at the scene[,] and staying a distance away." As it relates to the counts involving a firearm under the accomplice liability theory, *e.g.*, the attempted murder and assault charges, Appellant asserts that there was insufficient evidence that she had any awareness that the principal brought a gun and, thus, she lacked the necessary criminal intent.

The State responds that "the evidence supported the inferences that [Appellant] planned the principal offense of robbery, executed that plan, was physically present during the robbery that led to the shooting of Javier Duarte-Aleman, and helped plan what to do with the gun after the robbery . . . ." According to the State, "[t]his evidence, viewed collectively, provided a basis for the jury to reasonabl[y] infer that [Appellant] was an accomplice, that she acted with the necessary intent, and that the . . . conduct was done in furtherance of the robbery or during the escape therefrom."

### i.     Accomplice Liability Generally

"An accomplice is a person who, as a result of his or her status as a party to an offense, is criminally responsible for a crime committed by another." *Sheppard v. State*,

312 Md. 118, 122 (1988), *abrogated on other grounds by State v. Hawkins*, 326 Md. 270 (1992). Such an individual "who knowingly, voluntarily, and with common interest with the principal offender, participates in the commission of a crime is a guilty participant, and in the eye of the law is equally culpable with the one who does the act." *Owens v. State*, 161 Md. App. 91, 99-100 (2005) (quoting *Woods v. State*, 315 Md. 591, 615 n.10 (1989)) (cleaned up); *see also* Md. Code Ann., Crim. Proc. § 4-204 (abrogating "the distinction between an accessory before the fact and a principal" and providing that "an accessory before the fact may be charged, tried, convicted, and sentenced as a principal").

According to our Supreme Court, accomplice liability manifests in two ways: *first*, responsibility for the principal offense, and *second*, responsibility for other criminal acts incidental to the commission of the principal offense. *Sheppard*, 312 Md. at 122. Appellant satisfies each form of accomplice liability. We address each in turn.

### ii. Appellant Participated in the Robbery as a Principal in the Second Degree

To establish a defendant's responsibility for the principal offense, "the State must prove that the accused participated in the offense either as a principal in the second degree (aider and abettor) or as an accessory before the fact (inciter)." *Id.*

A principal in the second degree is not the actual perpetrator, but one who "aid[s], counsel[s], command[s], or encourage[es], either actually or constructively, the commission of the felony in the person's presence." *Odum v. State*, 156 Md. App. 184, 192 (2004). Conversely, "[a]n accessory before the fact is one who is guilty of felony by reason of having aided, counseled, commanded or encouraged the commission thereof,

7

without having been present either actually or constructively at the moment of perpetration." *Garcia v. State*, 480 Md. 467, 478 (2022) (quoting *State v. Ward*, 284 Md. 189, 197 (1978), *overruled in part on other grounds by Lewis v. State*, 285 Md. 705 (1979)). Thus, what separates a principal in the second degree from an accessory before the fact is the requirement that the principal in the second degree be present either "actually or constructively" when the crime occurs.[2]

*Owens*, *supra*, is instructive. In *Owens*, the defendant and several other men confronted two individuals who were attempting to purchase heroin. 161 Md. App. at 95. The defendant instructed the two men to lift their shirts and asked what they were doing there. *Id.* When one man explained they were looking to buy drugs, the defendant replied, "well, buy it then," and drew a gun. *Id.* at 95-96. At that moment, someone from the group of men standing behind the defendant emerged and opened fire. *Id.* at 96.

At trial, the defendant was convicted of attempted second-degree murder, first-degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, and carrying a handgun. *Id.* at 95. Although the principal was acquitted at trial, this Court upheld the sufficiency of the defendant's convictions under an accomplice liability theory, reasoning that "[t]here was ample evidence that the shots were fired during an assault that [the defendant] and the shooter had jointly undertaken." *Id.* at 107.

---

[2]     Although the General Assembly made certain revisions to the accessory-before-the-fact statute in 2002, our Supreme Court clarified that, in doing so, "the Legislature did not . . . disturb the factual definitions of an accessory before the fact and second-degree principal. Instead, 'the words accessory before the fact and principal have retained their judicially determined meanings.'" *Garcia v. State*, 480 Md. 467, 480 (2022) (quoting Md. Code Ann., Crim. Proc. § 4-204).

Specifically, "the jury could infer from the circumstances that [the defendant] initiated the criminal episode, by leading the group of five or six men that included the shooter and by threatening [the two men]." *Id.* Further, the defendant's actions "might reasonably be understood to have been 'counsel, command, or encourage[ment to] the principal in the first degree in the commission of that offense.'" *Id.*

Here, as in *Owens*, the evidence supported an inference that Appellant was a principal in the second degree. White testified that Satchell and McCullough instructed her to "get dressed and wait for [Appellant]'s instructions." Thereafter, Appellant directed White to "put on [a] pretty black dress" and "lure the men out of the house so that they could take care of the rest." White testified that the purpose of Appellant's plan was to use White as "bait" to "lure them out of the house" and "rob them." When White declined to participate in the plan, Appellant replaced her with another housemate, Ellis. Viewed collectively, as in *Owens*, the evidence supported an inference that Appellant "aid[ed], counsel[ed], command[ed], and encourage[ed]" the robbery.

Beyond aiding, counseling, commanding, or encouraging the robbery, the evidence also supported a reasonable inference that Appellant was present for, and participated in, the robbery (as required to be a principal in the second degree). On direct examination, Duarte-Aleman identified Appellant as the woman with "long hair" who appeared in the backyard of 403 Elizabeth Street the night he was shot. Detective Barkley also testified that he observed Appellant in the surveillance footage near 403 Elizabeth Street, and Appellant herself stated that she was in the general area with one other female at the time

9

of the shooting.[3] *See Madero v. State*, 31 Md. App. 500, 506 (1976) (holding that the defendant "was properly tried as a principal in the second degree" where "there was evidence from which a jury could find that [he] was present at the scene of the crime").

Appellant continues that "*nothing* [Appellant] did during that time period in any way aided or abetted the shooter" because there was no evidence that the shooter was present (i) for the conversation between Appellant, Satchell, and McCullough discussing the robbery, or (ii) during the initial interaction between Appellant, Satchell, and Ellis when they approached the 403 Elizabeth Street residence. But even if that were true, to be a principal, the law only requires that one (i) "aided, counseled, commanded or encouraged the commission" of the principal offense, and (ii) was actually or constructively present when the principal offense was committed. *See Garcia*, 480 Md. at 478. Because the evidence sufficiently supported a reasonable inference as to each, we conclude that there was sufficient evidence that Appellant was a principal in the second degree vis à vis the robbery.

### iii. Other Crimes Were Committed in Furtherance of, and in Escape from, the Robbery for Which Appellant was a Principal in the Second Degree

We now turn to the second form of accomplice liability, often referred to as "*Sheppard* liability." *See id.* at 485. To establish a defendant's responsibility for other criminal acts that are incidental to the commission of the principal offense, the State must

---

[3] Even if Appellant was not physically present during the robbery, that she aided, counseled, commanded, or encouraged the commission of the robbery would suffice to make her an accessory before the fact (and thus culpable for the principal offense).

10

prove (i) "that the accused participated in the principal offense either as a principal in the first degree (perpetrator), a principal in the second degree (aider and abettor) or as an accessory before the fact (inciter)," and (ii) "the charged offense was done in furtherance of the commission of the principal offense or the escape therefrom." *Sheppard*, 312 Md. at 122-23. Having already addressed whether Appellant was a principal in the second degree, we turn to the second prong.

*Sheppard*, *supra*, is instructive. In *Sheppard*, the defendant and two other men, one of whom was armed, robbed a convenience store. *Id.* at 120. As the men fled to their getaway car, operated by a fourth man, the armed man shot at a deliveryman who pursued them from the store. *Id.* The defendant was apprehended after the vehicle crashed, but his three other accomplices escaped on foot. *Id.* at 121. During the ensuing chase, the armed man fired several shots at police officers. *Id.*

At trial, the defendant was convicted of assault with intent to murder the officers. As Appellant does here, the defendant argued that "he was not an accomplice to the offenses against the police officers because he did not aid and abet the commission of the crimes." *Id.* Our Supreme Court upheld the defendant's convictions on an accomplice liability theory, even though he was already in police custody at the time another member of the group fired at the officers. *Id.* As the Court reasoned, there was sufficient evidence that the principal offense was armed robbery and "[t]he aggravated assaults against the police officers, perpetrated during the escape from the commission of the robbery, were secondary or incidental offenses." *Id.* at 123.

We conclude that, as in *Sheppard*, the evidence here supported an inference that the shooting and assaults were done in furtherance of the robbery and escape therefrom. The victim witnesses—Damian Rivera Penaloza, Javier Duarte-Aleman, Ismael Martinez Penaloza, and Jose Alfredo Villanueva Lozano—each testified that on the evening of the robbery, three individuals—later identified as Satchell, Appellant, and Ellis—came to 403 Elizabeth Street and offered the men the "services of" Appellant and Ellis. The men testified that, after they declined, Satchell, Appellant, and Ellis remained on the property, but walked approximately twenty to thirty yards away. Roughly ten minutes later, two other men—later identified as Bivens and McCullough—joined the trio and approached the residence at 403 Elizabeth Street, initiating a physical dispute and demanding money from the men. During the altercation, Bivens displayed a firearm and pointed it at the group. After Duarte-Aleman broke free of Satchell and began to enter the back door of the residence, Bivens shot the fleeing Duarte-Aleman.

This evidence, viewed collectively, supports a reasonable inference that Bivens used the firearm to threaten the men into giving him and his co-defendants money, and to prevent Duarte-Aleman from escaping and calling for help. Much like in *Sheppard*, the shooting and assaults perpetrated during the escape from the commission of the robbery were secondary or incidental offenses for which the accomplice is culpable.

12

It does not matter that Appellant apparently did not fire the gun. Just as there was evidence in *Sheppard*[4] and *Owens* that the respective defendants planned and were present for the principal offenses (but did not fire the gun), there is ample evidence to support the inferences that (i) Appellant planned, executed, and was present for the robbery, and (ii) the firearm was used in furtherance of and escape from the robbery.

Appellant argues that the shooter's use of a gun was "fresh and anew," and thus, Appellant did not possess the criminal intent necessary because "[s]he had no reason to know the intent of the shooter, much less share it." This ignores the entire premise of accomplice liability, which recognizes that an accomplice may hold a different criminal intent than the principal. *See Garcia*, 480 Md. at 480 ("An accessory's *mens rea* is 'unique' to them, i.e., an 'aider and abettor or an accessory before the fact may be more blameworthy than the principal in the first degree or equally blameworthy or less blameworthy.'") (quoting *Harvey v. State*, 111 Md. App. 401, 408 (1996)); *see also Diggs & Allen v. State*, 213 Md. App. 28, 90 (2014) (holding that there was sufficient evidence for the jury to conclude the defendant "had sufficient *mens rea* to be held accountable for the shooting, even if he was not the triggerman" where there was "ample evidence presented at trial that [the defendant] intended to commit the armed robbery, participated in the planning of the scheme, and actively participated in the robbery"). Here, as outlined above, the evidence sufficiently supported a reasonable inference that Appellant had the criminal intent to

---

[4]  The facts in *Sheppard* are more attenuated than those here. Unlike in *Sheppard*, where the defendant was already apprehended when another group member shot at officers, here, there was evidence to support an inference that Appellant was with the shooter during and after the shooting.

commit a robbery. Appellant intended to commit the robbery, participated in its planning, and actively participated in it. That is all that is required, even if crimes other than robbery were committed in the aftermath.

In sum, we conclude that the evidence, when viewed in the light most favorable to the State, was sufficient to support both forms of accomplice liability.

**C.    A SUFFICIENT FACTUAL BASIS EXISTED TO SUPPORT APPELLANT'S CONVICTION FOR ILLEGAL POSSESSION OF A FIREARM UNDER A THEORY OF CONSTRUCTIVE POSSESSION**

Appellant argues that the evidence was insufficient to establish that Appellant had constructive possession of the revolver that law enforcement recovered in an alley. Specifically, Appellant contends that there was no evidence that she was near, possessed, or handled the revolver in any way. The State, on the other hand, does not dispute that there was no evidence of Appellant's direct physical possession of the firearm, but argues the evidence supported constructive possession. Specifically, the State argues that based on the evidence provided, there was "a rational basis for the jury to infer that [Appellant] knew of the presence and illicit nature of the firearm . . . ."

"Possession may either be 'actual or constructive, exclusive or joint in nature.'" *Cerrato–Molina v. State*, 223 Md. App. 329, 335-36 (2015) (quoting *Smith v. State,* 415 Md. 174, 187 (2010)); *see* Md. Code Ann., Crim. Law § 5-101(v) (defining "possess" as the "means to exercise actual or constructive dominion or control over a thing by one or more persons"). "To prove possession of contraband, whether actual or constructive, joint or individual, the State must prove, beyond a reasonable doubt, that the accused knew 'of

14

both the presence and the general character or illicit nature of the substance.'" *White v. State*, 250 Md. App. 604, 651 (2021) (quoting *Dawkins v. State*, 313 Md. 638, 651 (1988)).

We have looked to four factors, commonly referred to as the "*Folk* factors," *see Folk v. State*, 11 Md. App. 508, 518 (1971), in determining whether evidence is sufficient to support a finding of constructive possession:

> 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises . . . in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

*White*, 250 Md. App. at 651 (quoting *Moseley v. State*, 245 Md. App. 491, 506 (2020)); *see State v. Gutierrez*, 446 Md. 221, 234 (2016). Although the *Folk* factors are most typically applied in drug cases, we have applied the factors in gun cases. *See Handy v. State*, 175 Md. App. 538, 564-65 (2007) (noting that, "[a]lthough most of the cases applying the *Folk* factors concern constructive possession of illegal drugs and drug paraphernalia, this Court has employed the same analysis in cases involving constructive possession of other contraband," and highlighting *McDonald v. State*, 141 Md. App. 371, 379 (2001), as a case in which "we addressed the issue of constructive possession of a handgun"). Application of the *Folk* factors requires the conclusion that sufficient evidence existed to support Appellant's firearm conviction under a theory of constructive possession.

*First*, as for the "proximity between the defendant and the contraband," *see Folk*, 11 Md. App. at 518, the jury had a sufficient basis to infer that Appellant was close to the revolver in a couch cushion at 322 Naylor Street. White testified that, after returning home

to the common area of the basement at 322 Naylor Street after the shooting, she heard shushing and discussions between Appellant, Satchell, McCullough, Bivens, and Ellis taking place in Appellant's bedroom (also in the basement). White testified she knew Appellant's voice "very well" and heard "[Appellant] . . . asking where he had put [the firearm]. And it was in a couch cushion, I believe." White further described the basement as "extremely small," with a common area with a couch between four or five bedrooms that have walls that are "so thin." Moreover, on cross-examination, White confirmed that it was Appellant and "one of the boys" discussing the firearm, stating: "I think they were trying to say they were going to take it from a couch cushion and place it in the alley or something, or hide it in the alley . . . ."

Under these facts, there was sufficient evidence to allow the jury to infer reasonably that (i) Appellant entered the residence with the shooter, (ii) Appellant was present for the placement of the revolver in a couch cushion, and (iii) the couch cushion was in a room adjacent to the room in which White heard Appellant and others discussing hiding the revolver. This factor thus weighs against Appellant. *See Gutierrez*, 446 Md. at 236 (concluding that the defendants were "in close proximity to" the drugs and firearm because "the small size of the apartment and the location of the drugs in the hallway, bathroom and kitchen rendered the drugs and gun available to both").

*Second*, as for "the fact that the contraband was within the view or otherwise within the knowledge of the defendant," *see Folk*, 11 Md. App. at 518, "knowledge may be proven by inferences from the totality of the evidence, circumstantial or direct, presented to the trier of fact." *Suddith*, 379 Md. at 432. Again, White testified that she heard Appellant

16

describe the location of the firearm and participate in a conversation about moving the firearm to a more discreet location outside of their shared residence. Given that the jury heard evidence that Appellant was discussing the firearm and the need to hide it, this factor also weighs against Appellant. *See Archie v. State*, 161 Md. App. 226, 247 (2005) (holding that the evidence was sufficient to support that the defendant had knowledge of certain drugs, where drugs were found in both the kitchen and the bathroom and the defendant was discovered in the bathroom attempting to flush the drugs down the toilet).

*Third*, as for whether there was "ownership or some possessory right in the premises . . . in which the contraband is found," *see Folk*, 11 Md. App. at 518, the evidence was undisputed that (i) Appellant lived in the basement of 322 Naylor Street with her co-defendants, (ii) White heard Appellant discussing hiding the gun in the couch at 322 Naylor Street, and (iii) the firearm was discovered in the alley outside 322 Naylor Street. Thus, the evidence sufficiently supported a reasonable inference that Appellant had some ownership or some possessory right in the premises where the firearm was found, and this factor too weighs against Appellant. *See Anaweck v. State*, 63 Md. App. 239, 243 (1985), *overruled on other grounds by Wynn v. State*, 351 Md. 307, 315 n.4 (1998) (holding that the fact that contraband was found "in the house of which [the defendant] was a resident did not prevent the inference" "that he had possession and control" of the contraband).

And *fourth*, as for "the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband," *see Folk*, 11 Md. App. at 518, again, Appellant jointly

17

participated in a robbery, during which a revolver was brandished and discharged. This factor also weighs against Appellant.

Appellant complains that the State relied largely on evidence that occurred "well after the shooting" to prove constructive possession. Such reliance, Appellant contends, "is insufficient to establish her participation in the principal offense, or in the role as inciter or encourager in the commission of the principal offense." But whether Appellant participated in the principal offense or was an "encourager" or an "inciter" is relevant to an accomplice liability analysis—not a constructive possession analysis.[5]

Because all four *Folk* factors weigh against Appellant, we conclude that the evidence was sufficient to establish, beyond a reasonable doubt, that Appellant constructively possessed the revolver.[6]

## II. THE TRIAL COURT DID NOT ERR IN INSTRUCTING THE JURY AS TO ACCOMPLICE LIABILITY

Appellant argues that no evidence supported an accomplice liability instruction because "the shooting was not [i]n furtherance of the crime" and, instead, it was "gratuitous and did not involve [Appellant] at all." Appellant continues that "[e]ven if, *arguendo*, the accomplice liability instruction was generated, it was error for the trial court to refuse to give the requested *Mumford* instruction."

---

[5] The evidence after the shooting is of particular importance here, where the verdict sheet specified that possession was alleged to have occurred "at Naylor Street, after the event."

[6] As to the requirement that the State prove that Appellant was a prohibited person, the parties stipulated to Appellant's prohibited status.

The State relies on its sufficiency arguments to establish that there was "some evidence" to generate the accomplice liability instruction. The State further contends that a *Mumford* instruction was not a correct statement of law in the context of accomplice liability.

### A.    STANDARD OF REVIEW

"Decisions of a trial court to give [or refuse] a jury instruction are reviewed under an abuse of discretion standard." *Lewis v. State*, 262 Md. App. 251, 286 (2024). When assessing whether there has been an abuse of discretion, Maryland appellate courts consider "(1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given." *Bazzle v. State*, 426 Md. 541, 549 (2012) (quoting *Stabb v. State*, 423 Md. 454, 465 (2011)); *see* Md. Rule 4-325(c).

As for the second prong, "[t]he threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." *Bazzle*, 426 Md. at 550 (quoting *Dishman v. State*, 352 Md. 279, 292-93 (1998)). The party requesting a jury instruction "must only produce some evidence to support the requested instruction." *Rainey v. State*, 252 Md. App. 578, 591 (2021). "The 'some evidence' standard is a 'fairly low hurdle for a defendant.'" *Hollins v. State*, 489 Md. 296, 311 (2024) (quoting *Arthur v. State*, 420 Md. 512, 526 (2011)). "In deciding whether there is some evidence to generate an instruction, we view 'the facts in the light most favorable to the requesting party . . . .'" *Rainey*, 252 Md. App. at 591 (quoting *Page v. State*, 222 Md. App. 648, 668-69 (2015)).

**B. THERE EXISTED SOME EVIDENCE TO GENERATE AN ACCOMPLICE LIABILITY INSTRUCTION**

At the State's request, the trial court instructed the jury on accomplice liability, using the standard Maryland Criminal Pattern Jury Instructions, MPJI-CR 6:00, making modifications only where specified in the pattern instruction.

Having determined that the evidence was legally sufficient to support Appellant's convictions under an accomplice liability theory, it necessarily follows that there was "some evidence" to generate an accomplice liability jury instruction. *See Jarvis v. State*, 487 Md. 548, 564 (2024) (noting that "the second requirement (whether the instruction is applicable in that case) is akin to assessing the sufficiency of the evidence"); *Bazzle*, 426 Md. at 550 ("A requested jury instruction is applicable if the evidence is sufficient to permit a jury to find its factual predicate."). Because one conclusion logically follows from the other, the trial court did not err in instructing the jury as to accomplice liability.

**C. A *MUMFORD* INSTRUCTION DOES NOT APPLY IN THE CONTEXT OF ACCOMPLICE LIABILITY**

Appellant argues that if the jury instruction was generated, the trial court erred when it declined to modify the pattern instruction to include a "*Mumford* instruction" and state that the jury "needed to find that the shooter's actions were not a fresh, new idea."[7] The State responds that Appellant's claim fails because the proposed modification was not a correct statement of the law as applied to accomplice liability.

---

[7] Appellant does not specify the charges to which the *Mumford* instruction should have applied.

20

A *Mumford* instruction essentially instructs the jury that, to convict a defendant in a felony murder case, they must find a causal connection between the felony and the killing, and that if the killing was independent and not in furtherance of the felony, the defendant cannot be held liable for that killing. *See Mumford v. State*, 19 Md. App. 640 (1974); *Watkins v. State*, 125 Md. App. 555, 572 (1999); *White v. State*, 140 Md. App. 520, 537 (2001).

There appears to be no caselaw—and Appellant offers none—suggesting a *Mumford* instruction applies in accomplice liability cases. Indeed, *Mumford* instructions appear to be limited to the felony-murder context. Although Appellant argues, on the other hand, that there is no caselaw suggesting that a *Mumford* instruction is *inapplicable* in the context of accomplice liability, there is good reason not to graft felony murder principles onto the accomplice liability landscape: the doctrines are hardly interchangeable.

Felony murder is a "legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder." *State v. Allen*, 387 Md. 389, 401 (2005) (quoting *State v. Buggs*, 995 S.W.2d 102, 106-07 (Tenn. 1999)). Accomplice liability, in contrast, is a type of vicarious liability whereby one "as a result of his or her status as a party to an offense, is criminally responsible for a crime committed by another." *Sheppard*, 312 Md. at 122. Under accomplice liability principles, the mens rea of one *person* can be attributed to another *person*; under felony murder principles, the mens rea of one *crime* can be attributed to another *crime*. Given these fundamental differences, it would be inappropriate to give a

*Mumford*-type instruction in an accomplice liability case.[8]   Because a *Mumford*-type

instruction is not a correct statement of law in the context of accomplice liability, the trial

court did not err in refusing to give such an instruction.

## III.   THE TRIAL COURT DID NOT ERR IN ALLOWING DETECTIVE BARKLEY'S NON-HEARSAY TESTIMONY REGARDING THE INVESTIGATIVE STEPS HE TOOK TO LOCATE THE REVOLVER

Appellant argues that Detective Barkley's testimony—during his interview of

Satchell, a co-defendant—that he instructed another detective to look in the alley near

Appellant's home for a gun wrapped in a black t-shirt was inadmissible hearsay.  Appellant

contends that because Satchell did not testify at Appellant's trial, admission of the

statement violated Appellant's confrontation rights.

The State responds that the statement was not hearsay because it was offered not for

its truth, but for its effect on the listener.  The State thus argues that, because it is not

hearsay, the Confrontation Clause was not implicated.

### A.   STANDARD OF REVIEW

We apply "the *de novo* standard of review to the issue of whether the Confrontation

Clause was violated . . . ."  *Snowden v. State*, 156 Md. App. 139, 143 n.4 (2004); *see also*

*White v. State*, 223 Md. App. 353, 393 (2015); *Davies v. State*, 198 Md. App. 400, 411

---

[8]   In any event, even if *Mumford* applied in accomplice liability cases, it would not have been generated here.  That is, to generate a *Mumford*-type instruction, there must be "some evidence" that any one of the crimes "was a fresh and independent product of the mind of one of the confederates, outside of, or foreign to, the common design."  *Mumford*, 19 Md. App. at 644.  Here, Appellant fails to supply the Court with the evidence that would, in her view, generate the instruction.

(2011). Relatedly, "a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility." *Bernadyn v. State*, 390 Md. 1, 8 (2005).

## B. BECAUSE DETECTIVE BARKLEY'S STATEMENT WAS NOT HEARSAY, THE CONFRONTATION CLAUSE IS NOT IMPLICATED AND WAS NOT VIOLATED

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[9] In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court "changed the framework for determining whether the right to confront adverse witnesses had been violated." *Derr v. State*, 434 Md. 88, 106 (2013). As our Supreme Court explained:

> Under the framework established by *Crawford* and its progeny, the Confrontation Clause only applies when an out-of-court statement constitutes testimonial hearsay. In other words, there are two limitations on the reach of the right to confront witnesses. First, the right only applies if a statement is testimonial; nontestimonial statements are governed by the applicable rules of evidence. Second, the Confrontation Clause only applies to hearsay, or out-of-court statements offered and received to establish the truth of the matter asserted.

---

[9] Article 21 of the Maryland Declaration of Rights also affords criminal defendants confrontation rights. *See* Md. Const. Decl. of Rts. art. 21 ("[I]n all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him; . . . [and] to examine the witnesses for and against him on oath."). Although our Supreme Court has held that the Confrontation Clause and Article 21 are not entirely coextensive, *see Leidig v. State*, 475 Md. 181, 186 (2021), Appellant waited until her reply brief to argue "that the State and federal confrontation clauses [a]re not required to be read together . . . ." Appellant thus waived that argument and, as a result, we do not analyze Appellant's confrontation arguments through the lens of Article 21. *See, e.g.*, *McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 574 n.6 (1999) ("Failure to articulate an argument in an opening brief constitutes a waiver of that issue.").

*Id.* at 106-07 (citations omitted). Although the framework is ordered as such, "[i]n addressing a claimed Confrontation Clause violation based upon the alleged admission of testimonial hearsay, we begin by determining whether the out-of-court statements at issue constituted hearsay . . . ." *Rainey v. State*, 246 Md. App. 160, 181 (2020).

As for the hearsay analysis, "'hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c).

> The threshold questions when a hearsay objection is raised are (1) whether the declaration at issue is a "statement," and (2) whether it is offered for the truth of the matter asserted. If the declaration is not a statement, or if it is not offered for the truth of the matter asserted, it is not hearsay and it will not be excluded under the hearsay rule.

*Parker v. State*, 408 Md. 428, 436 (2009) (quoting *Stoddard v. State*, 389 Md. 681, 688-89 (2005)). Hearsay is inadmissible "[e]xcept as provided by the[] rules or permitted by applicable constitutional provisions or statutes . . . ." Md. Rule 5-802.

At trial, Detective Barkley testified that he interviewed one of Appellant's co-accomplices, Joshua Satchell. During the interview, Detective Barkley directed his colleague, Detective Miller, to the alley near 322 Naylor Street. Trial counsel objected to this evidence on hearsay and Confrontation Clause grounds. Specifically, trial counsel argued that the State was just trying to find "a way of getting around hearsay," contending that counsel "ha[s] no ability to cross-examine Joshua Satchell . . . ." The trial court disagreed, noting that it was "not satisfied that it's violating the right to confrontation with Joshua Satchell or that it's . . . implicating the hearsay rule by virtue of the fact that this officer took some action based upon an interview of one of the co-defendants." Ultimately,

24

the trial court allowed Detective Barkley to testify that he "told Detective Miller to go to the alleyway behind 322 Naylor Street and look for a possible firearm located in a black tee shirt."

"The general rule is that [an out-of-court statement] is admissible if introduced for the purpose of showing that a party relied on or acted upon the statement and not for the purpose of showing that the facts stated in the declaration are true." *Watson v. State*, 92 Md. App. 494, 500 (1992). "In criminal cases, an arresting officer or investigating officer should not be put in a false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct." *McCray v. State*, 84 Md. App. 513, 518 (1990).

Detective Barkley's statement was non-hearsay, offered, not to prove its truth, but to explain briefly the steps the detectives took during their investigation. *See Frobouck v. State*, 212 Md. App. 262, 283 (2013) (holding that certain statements were not hearsay because they "were not offered to prove the truth of the matter asserted[,] . . . but, rather, to explain *briefly* what brought the officers to the scene in the first place"); *see also McCray*, 84 Md. App. at 518 (holding that a statement was not hearsay because it was not "not offered to prove the truth of the matter asserted, rather it was offered to explain how [law enforcement] was able to make contact with [the defendant] and then with [a co-conspirator]"). That is, the State did not offer Detective Barkley's statement to establish that Satchell, in fact, said that the gun was in the alley, but to show why law enforcement eventually looked in the alley.

25

In arguing to the contrary, Appellant relies on *Zemo v. State*, 101 Md. App. 303 (1994). *Zemo* is distinguishable. In *Zemo*, during a jury trial for breaking and entering, the lead detective was permitted to testify, among other things:

> that he received evidence about the crime from a confidential informant, that the informant's information put him on the trail of [Zemo] and other suspects, that other parts of the informant's information were corroborated and turned out to be correct, and that, acting on the informant's information, he arrested [Zemo].

*Id.* at 306. We concluded that the detective's testimony was inadmissible hearsay (the admission of which violated the defendant's confrontation rights), concluding that "[t]he only possible import of such testimony was to convey the message that the confidential informant 1) knew who committed the crime, 2) was credible, and 3) implicated [Zemo]." *Id.* Importantly, we cautioned that our ruling was "not counseling an overreaction to every passing or random injection of some arguably prejudicial material into a trial," but that we were specifically "objecting to . . . a sustained and deliberate line of inquiry that can have had no other purpose than to put before the jury an entire body of information that was none of the jury's business." *Id.*

In a series of cases, we have essentially limited *Zemo* to its facts. For instance, in *Frobouck*, 212 Md. App. at 281-82, during a jury trial for manufacturing marijuana, a deputy sheriff was asked why he responded to that location and replied that he had been "dispatched there for a suspected marijuana grow." On appeal, we reasoned that the statements were "not offered to prove the truth of the matter asserted—that there was a 'marijuana grow'—but, rather, to explain *briefly* what brought the officers to the scene in the first place." *Id.* at 283. In so ruling, we rejected the appellant's reliance on *Zemo*,

26

highlighting that "[t]his was not a 'sustained and deliberate' line of questioning like that in *Zemo* which we held to have served 'no legitimate purpose.'" *Id.* (quoting *Zemo*, 101 Md. App. at 306).

Similarly, in *Hallowell v. State*, 235 Md. App. 484, 522-24 (2018), we held that computer aided dispatch (CAD) report summaries, which included statements made by the 911 caller to the dispatcher and then relayed to responders, were non-hearsay. We concluded that the facts then before us were "more like *Frobouck* than *Zemo*," because "[h]ere, unlike in *Zemo*, the disputed statements in the CAD report were simply not part of 'a sustained and deliberate line of inquiry' for an illegitimate purpose." *Id.* at 523-24.

Finally, in *Geiger v. State*, 235 Md. App. 102, 129 (2017), we emphasized *Zemo*'s limited reach, highlighting that "[a] genuine reading of *Zemo* makes clear that the State's error that led to . . . reversal . . . consisted not simply of the introduction of two items of significantly prejudicial evidence against the defendant, but in the deliberate and protracted fashion in which it was done." That is, we explained that "the dispositive flaw [in *Zemo*] lay not simply in the State's introduction of inadmissible and prejudicial material but in having done so deliberately and repeatedly," while emphasizing "the pivotal difference between an inadvertent error or even a purposeful but fleeting error, on the one hand, and a deliberate and sustained exploitation of repeated error, on the other hand." *Id.* at 129, 130.

As with *Frobouck* and *Hallowell*, Detective Barkley's testimony was not a sustained line of questioning with no legitimate purpose, and it was not the subject of an entire line of inquiry. Instead, Detective Barkley's testimony was a single statement, which

27

evidently led law enforcement to the alley near 322 Naylor Street to look for a firearm. Again, Detective Barkley's testimony was offered, not to prove its truth, but to explain why Detective Miller went to 322 Naylor Street, weeks after the shooting, to look for the revolver. Because Detective Barkley's statement was not offered for its truth and was not part of a "sustained and deliberate line of inquiry for an 'illegitimate purpose,'" *see Zemo*, 101 Md. App. at 306, we conclude that the court did not err in admitting the statement as non-hearsay.

And given that Detective Barkley's challenged testimony was not hearsay, it necessarily follows that, because the Confrontation Clause only applies to testimonial hearsay, *see Smith v. Arizona*, 602 U.S. 779, 784 (2024); *Derr*, 434 Md. at 106, Appellant's confrontation rights were not violated. *See Rainey*, 246 Md. App. at 177 (holding that "[b]efore a court applies [a *Crawford*] analysis to determine whether [the evidence] is 'testimonial,' it must first answer a predicate question—whether the [evidence] is hearsay").

## CONCLUSION

We conclude there was a sufficient factual basis to support Appellant's convictions under theories of accomplice liability and constructive possession. Relatedly, the trial court did not err in instructing the jury as to accomplice liability. Finally, the trial court also did not err in allowing Detective Barkley's non-hearsay testimony regarding the investigative steps he took to locate the revolver. For these reasons, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

28